Filed 8/28/13  (unmodified opinion attached)

# IN THE SUPREME COURT OF CALIFORNIA

|  |  |  |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S192644 |
| v. | ) | |
| | ) | |
| TARE NICHOLAS BELTRAN, | ) | |
| | ) | San Francisco City & County |
| Defendant and Appellant. | ) | Super. Ct. Nos. 175503, 203443 |
| _____ | ) | |

## ORDER MODIFYING OPINION AND
## DENYING PETITION FOR REHEARING

**THE COURT:**

The opinion in this matter filed on June 3, 2013, and appearing at 56 Cal.4th 935, is modified as follows:

At 56 Cal.4th, page 958, the disposition is modified to read as follows:  "The judgment is reversed and the matter remanded to the Court of Appeal for further proceedings consistent with the views expressed herein."

The modification changes the judgment.

The petition for rehearing is denied.

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
       Plaintiff and Respondent, )
)             S192644
v. )
)        Ct.App. 1/4 A124392
TARE NICHOLAS BELTRAN, )
)     San Francisco City & County
       Defendant and Appellant. )   Super. Ct. Nos. 175503, 203443
_____)

       Here we clarify what kind of provocation will suffice to constitute heat of passion and reduce a murder to manslaughter.  The Attorney General argues the provocation must be of a kind that would cause an ordinary person of average disposition *to kill*.  We disagree.  Nearly one hundred years ago, this court explained that, when examining heat of passion in the context of manslaughter, the fundamental "inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." (*People v. Logan* (1917) 175 Cal. 45, 49 (*Logan*).)  The proper standard focuses upon whether the person of average disposition would be induced to react from passion and not from judgment.

# I. BACKGROUND

Defendant Tare Nicholas Beltran and Claire Joyce Tempongko met in November 1998 and began dating. In January 1999, defendant moved into the San Francisco apartment Tempongko shared with her nine-year-old son J.N. and her younger daughter. J.N. called defendant "dad." In several incidents, defendant physically abused Tempongko. In April 1999, he threw her to the ground and dragged her by the hair. Three weeks later, he grabbed her and tried to remove her from a friend's apartment. In November 1999, he took her into the bedroom and barricaded the door. The police were summoned and forced the door open.

At some point, defendant moved from the apartment but retained a key. Tempongko obtained a protective order requiring him to stay 100 yards away from the residence. In September 2000, defendant, who was drunk, was arrested outside of the apartment.

Tempongko began dating Michael Houtz. She once told Houtz that defendant said their relationship would end over his dead body or hers.

On October 22, 2000, Houtz, Tempongko and the children went shopping in Sacramento. When Tempongko received a call on her cell phone, J.N. answered, then handed the phone to his mother, saying, "Dad is mad." The heated conversation ended after Tempongko yelled into the phone and hung up. Houtz testified that he could not understand Tempongko's side of the interaction because she was not speaking in English. Tempongko explained that "he" was bothering her, and Houtz believed she was referring to defendant. After the call, Tempongko's demeanor changed completely and she became quite upset. On the drive home, Tempongko received several more calls, some of which she answered. Tempongko became "fidgety" and appeared nervous about getting home by 7:00 p.m. as planned.

As they neared her apartment, Tempongko saw a green Honda parked nearby and told Houtz to drive around the block. Houtz saw a "Caucasian or Hispanic" man slumped down in the Honda's driver's seat. Tempongko became very frightened and repeatedly scanned the area. She told Houtz to drive around the block three additional times. The green Honda was gone when Houtz parked in front of the apartment building. Tempongko and the children ran inside without saying goodbye. Shortly thereafter, Houtz phoned Tempongko on both her cell and home phones. No one accepted the cell call. J.N. answered the home phone and said Tempongko was not there. Houtz drove back to the building and saw a man running across the street. Houtz checked the front door of the apartment. Seeing nothing amiss, he headed home to Vallejo. He called Tempongko's cell phone several times during his drive but could not reach her.

Tempongko's apartment building had three units. Christina Maldonado lived on the top floor. On the evening of October 22, 2000, she heard sounds of a physical altercation coming from Tempongko's apartment. There was a muffled male voice and children screaming that they loved their mother. She did not hear an adult female voice. When Maldonado left her apartment and looked down the stairs, she saw J.N. run out of Tempongko's unit. Another neighbor caught up with J.N., who was crying. J.N. said that his "dad" stabbed his mother and ran away. The neighbors found Tempongko in her apartment bloody and unresponsive. The apartment was in disarray; the phone had been unplugged from the wall. An autopsy revealed several blunt force injuries and 17 stab wounds to Tempongko's face, upper body, arms, and hands. After running from the scene, defendant fled to Mexico where he was arrested six years later.

J.N. was 18 years old at the time of trial. He testified that, after the family got home on October 22, 2000, Tempongko received several cell phone calls. Tempongko was "frantic," arguing with someone on the phone, and telling the

4

caller not to come to the apartment. Thirty to 45 minutes later, defendant banged loudly on the front door, then entered without being let in. He began yelling and asking Tempongko where she had been and with whom. The two argued for five or 10 minutes. Defendant then walked briskly to the kitchen, returned to the living room with a large knife, and repeatedly stabbed Tempongko. She futilely raised her arms in self-defense. Defendant continued to stab her as she slumped to the floor, then fled, taking the knife with him. Nearby, police later recovered a knife with Tempongko's blood on it.

Defendant testified that he and Tempongko had an up and down relationship. While they discussed having their own children, Tempongko was concerned that defendant would leave her as the fathers of her two other children had done. At some point, they decided Tempongko would try to become pregnant, but defendant believed she was unsuccessful. Defendant acknowledged he had grabbed Tempongko on several occasions but denied pulling her hair.

On the day of the killing, defendant and Tempongko had planned to have lunch together. However, she called him and said she was going shopping in Vallejo with a female friend. She offered to meet defendant after she returned. At her request, defendant called Tempongko at about 3:00 p.m. to see if they were on their way back to San Francisco. He denied being upset or demanding that she be home by 7:00 p.m. That evening, he went to the apartment and let himself in with a key because Tempongko was expecting him. Defendant was calm but Tempongko was upset, asking why he was late. The argument became heated. Tempongko hurled insults, calling defendant a " 'fucking illegal' " and a " 'nobody.' " She said she " 'could get better than [him].' " Defendant said he was leaving, which upset Tempongko further. She stated: " 'Fuck you. I was right. I knew you were going to walk away someday. That's why I killed your bastard. I got an abortion.' " Defendant was shocked; Tempongko had never

5

mentioned an abortion. He remembered nothing else until he found himself standing in the living room with a bloody knife. He admitted that he discarded the knife and fled to Mexico.

Defendant was charged with murder and use of a deadly weapon.[1] The trial court gave instructions on first and second degree murder, as well as voluntary manslaughter based upon a sudden quarrel or heat of passion.[2] The jury found defendant guilty of second degree murder with the use enhancement.

A divided Court of Appeal concluded the voluntary manslaughter instruction was prejudicially erroneous and reversed defendant's conviction. We clarify the appropriate standard and reverse the judgment of the Court of Appeal.

## II. DISCUSSION

### A. *Legal Introduction*

" 'Homicide is the killing of a human being by another . . . .' " (*People v. Antick* (1975) 15 Cal.3d 79, 87.) Criminal homicide is divided into two types: murder and manslaughter. "Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) Malice aforethought may be express or implied. (§ 188.) "Express malice is an intent to kill. . . . Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder. (*People v. Concha* (2009) 47 Cal.4th 653, 662.) "Second degree murder is the unlawful killing of a human being with malice aforethought but without the

---

[1] Penal Code, sections 187, subdivision (a), 12022, subdivision (b)(1). Subsequent statutory references will be to the Penal Code unless noted.

[2] Section 192, subdivision (a).

6

additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151.)

Manslaughter is a lesser included offense of murder. (§ 192; *People v. Thomas* (2012) 53 Cal.4th 771, 813.) The mens rea element required for murder is a state of mind constituting either express or implied malice. A person who kills without malice does not commit murder. Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter.[3] Heat of passion arises if, " 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' " (*People v. Barton* (1995) 12 Cal.4th 186, 201.) Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice.

This case involves the nature of provocation required to give rise to the heat of passion that obscures reason and precludes the mental state of malice. The People propose a test that would require a finding not only that an ordinary person of average disposition would be liable to act rashly and without reflection, but that such a person would act rashly in a particular manner, namely, by killing. We decline to adopt that test.

---

[3]    A killing committed under the unreasonable but good faith belief in the need to act in self-defense is a killing done without malice and also constitutes voluntary manslaughter. (*People v. Blacksher* (2011) 52 Cal.4th 769, 832.) That form of manslaughter is not at issue here.

7

## B. Trial Court Proceedings

The prosecutor argued that defendant, motivated by jealousy, went to Tempongko's apartment intending to kill her, thus acting with express malice formed after premeditation and deliberation. The sole defense theory was that defendant killed in the heat of passion. When the victim said she had aborted her pregnancy, the news was so disturbing that defendant acted not from reflection but in reaction to the provocation.[4] The prosecutor urged the jury to reject that argument. She maintained that there was no credible evidence showing the victim had said anything about an abortion. Alternatively, even if the victim did mention an abortion, the alleged statements did not amount to adequate provocation.[5]

During the settling of instructions, the trial court told the parties it would give CALCRIM No. 570 (2006 version) explaining voluntary manslaughter based on heat of passion. Defense counsel requested the instruction be modified to clarify that the jury could find defendant acted in the heat of passion even if he intended to kill the victim. The trial court and the parties properly agreed that heat of passion could still apply in such a circumstance. (See *People v. Lasko* (2000)

---

[4]  Defense counsel argued in part: "A lot of times when you have these homicide cases, there is this mistake and the prosecutor likes to argue, 'Well, if someone said that to me, "I killed your bastard; I had an abortion,[] I was right to do that,["] then I wouldn't jump up and kill the person. That's not how a reasonable person acts. That's not how an average person reacts.' That's not the law. [¶] Look at this very carefully. The provocation would have caused a person of average disposition to act rashly and without due deliberation. If the provocation causes a person to act rashly and without thinking, that's what this provocation is under the law. It doesn't say the provocation would have caused a person of average disposition to kill. If that were the law, then that would be the argument, well, if someone said that to me, 'I wouldn't kill the person.' And instead the law is provocation that causes a person to act rashly impulsively without thinking."

[5]  The prosecutor argued with respect to heat of passion in part: "And the provocation has to be such that a person of average disposition to act with passion rather than judgment [*sic*]. We would have probably millions more homicides a year if everyone could use words that may be—although I don't disbelieve. I don't agree that this is what happened. It's an illogical interpretation of the facts. You stub your toe. You're angry, might cuss a few words. You don't go out and kill somebody. [¶] We've all gotten cut off in traffic. We say the few choice words, 'Oh, my God.' We don't gun the pedal and start trying to hit the car in front of us to try to kill the person who cut us off. Can you imagine if that was permissible, 'Oh, my God, I acted [] without judgment and rash. I got so angry. I was insulted.' That's not the standard. It's a reasonable person, and you're all reasonable people and you know that it's illogical that even these words were uttered."

8

23 Cal.4th 101, 108 (*Lasko*) ["a person who *intentionally* kills as a result of provocation, that is, 'upon a sudden quarrel or heat of passion,' lacks malice and is guilty not of murder but of the lesser offense of voluntary manslaughter"].) Although the prosecutor argued the standard version of CALCRIM No. 570 already covered the point, the trial court agreed to modify the instruction by adding language taken from CALJIC No. 8.40 (Voluntary Manslaughter—Defined [2004 rev.]).[6] The final instruction given to the jury was as follows:

> "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or heat of passion.
>
> "The defendant killed someone because of sudden quarrel or in the heat of passion if, number one, the defendant killed another human being without malice aforethought but either with an intent to kill or with a conscious disregard of human life; number two, the defendant was provoked; number three, as a result of provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and, number four, the provocation would have caused a person of average disposition to act rashly and without due deliberation. That is, from passion rather than from judgment.
>
> "Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.
>
> "Now, in order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I've defined it above.

---

**6** The CALCRIM User's Guide expressly cautions that "[t]he CALJIC and CALCRIM instructions should *never* be used together. While the legal principles are obviously the same, the organization of concepts is approached differently. Mixing the two sets of instructions into a unified whole cannot be done and may result in omissions or confusion that could severely compromise clarity and accuracy." (Jud. Council of Cal. Crim. Jury Instns. (2012) Guide for Using Jud. Council of Cal. Crim. Jury Instns., p. xxvi.) Of course, the trial court may modify any proposed instruction to meet the needs of a specific trial, so long as the instruction given properly states the law and does not create confusion.

9

"While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation can occur over a short or a long period of time.

"Now, it is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient.

"*In deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts.* [¶] . . . [¶]

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as [the] result of sudden quarrel or heat of passion. If the People . . . have not met this burden, you must find the defendant not guilty [of murder]." (Italics added.)

During deliberations, the jury sent out the following note: "In instruction 570: 'In deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts.' Does this mean to commit the same crime (homicide) or can it be other, less severe, rash acts[?]" After consulting counsel, the trial court responded: "The provocation involved must be such as to cause a person of average disposition in the same situation and knowing the same facts to do an act rashly[7] and under the influence of such intense emotion that his judgment or reasoning process was obscured. This is an

---

**7** The clerk's transcript contains the written draft of the trial court's response, which we quote here. The reporter's transcript ungrammatically renders the phrase "knowing the same facts to do an act rashly" as "knowing the same facts to do *and* act rashly." We assume this rendering resulted from a transcription error. (See *People v. Smith* (1983) 33 Cal.3d 596, 599 [" 'It may be said . . . as a general rule that when, as in this case, the record is in conflict it will be harmonized if possible; but where this is not possible that part of the record will prevail, which, because of its origin and nature or otherwise, is entitled to greater credence [citation]. Therefore whether the recitals in the clerk's minutes should prevail as against contrary statements in the reporter's transcript, must depend upon the circumstances of each particular case.' "]; *People v. Freitas* (2009) 179 Cal.App.4th 747, 750, fn. 2 ["When a clerk's transcript conflicts with a reporter's transcript, the question of which of the two controls is determined by consideration of the circumstances of each case."].)

10

objective test and not a subjective test." As noted, the jury convicted defendant of second degree murder.

### C. Court of Appeal Opinion

On appeal, defendant argued the instruction given was misleading. Defendant claimed that telling jurors to consider how "a person would *react*" in the face of the provocation led them to question whether an average person would react *physically* and kill, as opposed to reacting *mentally*, experiencing obscured reason precluding the formation of malice. Defendant further argued that the prosecutor's comments during closing arguments exacerbated the error by suggesting the ordinary person's *conduct* in reaction to provocation was relevant in determining whether provocation was legally adequate.

The Court of Appeal agreed with defendant that the given instruction was ambiguous and rejected the Attorney General's argument that the relevant standard was whether an ordinary person of average disposition would kill under the same circumstances. A majority of the Court of Appeal concluded the ambiguity in the instruction prejudiced defendant and reversed his murder conviction. (See discussion, *post*.)

### D. The Proper Standard for Provocation

The People argue the proper standard for assessing the adequacy of provocation is whether an ordinary person of average disposition would be moved to kill. They urge that juries should be expressly told to consider whether an ordinary person would kill under the circumstances at issue.

The People assert their view is supported by the common law. However, a review of the common law, from which our manslaughter statute originally derived,[8] undermines their argument. Originally at common law, voluntary

---

[8]    Cf. *People v. Cox* (2000) 23 Cal.4th 665, 671 (§ 192, subd. (b) "codifie[d] the traditional common law form of involuntary manslaughter"); *Lasko, supra,* 23 Cal.4th at page 110 (noting that "[o]ur

11

manslaughter did not refer to a person of average disposition. Rather, the early cases simply defined voluntary manslaughter as occurring under specified circumstances. Those circumstances did not justify the killing but, nevertheless, rendered it less blameworthy than murder because of adequate provocation. In the seminal case of *Regina v. Mawgridge* (1707) 84 Eng.Rep. 1107, Lord Holt explained at length what particular circumstances would and would not constitute voluntary manslaughter at common law. "Provocations which are not sufficient were said by Lord Holt to be (1) words of reproach or infamy; (2) affronting gestures; and (3) trespasses upon one's land. On the other hand, provocations which may under the circumstances be adequate were said to be (1) angry and sudden assaults upon one; (2) similar assaults upon one's friend who is with one at the time; (3) seeing any person abused by force and going to his rescue; (4) unlawful arrest; and (5) seeing one's wife in an act of adultery." (2 Burdick, The Law of Crime (1946) § 426a, p. 188; see *Mawgridge, supra,* 84 Eng.Rep. at pp. 1112-1115; see also *Manning's Case* (1670) 83 Eng.Rep. 112 [concluding the defendant's killing of a man "committing adultery with his wife in the very act" constituted "but manslaughter" and ordering the defendant's hand be burned as punishment but directing "the executioner to burn him gently, because there could not be greater provocation than this"].)

At some point, cases introduced the concept of the ordinary person of average disposition to the analysis, not only to generalize the circumstances that would mitigate murder to manslaughter, but also to allow the jury to determine what circumstances would constitute adequate provocation. One of the earliest cases recognizing the role of the person of average disposition in voluntary manslaughter jurisprudence was *Maher v. People* (Mich. 1862) 10 Mich. 212

conclusion that voluntary manslaughter does not require an intent to kill is consistent with the common law").

12

(*Maher*). *Maher* explained why a killing resulting from adequate provocation should result in mitigated punishment: "[I]f the act of killing, though intentional, be committed under the influence of passion or in heat of blood, produced by an adequate or reasonable provocation, and before a reasonable time has elapsed for the blood to cool and reason to resume its habitual control, and is the result of the temporary excitement, by which the control of reason was disturbed, rather than of any wickedness of heart or cruelty or recklessness of disposition; then the law, out of indulgence to the frailty of human nature, or rather, in recognition of the laws upon which human nature is constituted, very properly regards the offense as of a less heinous character than murder, and gives it the designation of manslaughter." (*Id.* at p. 219.) *Maher* examined what level of provocation was necessary, noting that "[i]t will not do to hold that reason should be entirely dethroned, or overpowered by passion so as to destroy intelligent volition" since "[s]uch a degree of mental disturbance would be equivalent to utter insanity, and, if the result of adequate provocation, would render the perpetrator morally innocent." (*Id.* at p. 220.) However, because manslaughter remains a felony, *Maher* recognized that a killing in response to adequate provocation is a less serious crime than murder. (*Ibid.*) Thus, as *Maher* reasoned, adequate provocation must "never [be] beyond that degree within which ordinary men have the power, and are, therefore, morally as well as legally bound to restrain their passions. It is only on the idea of a violation of this clear duty, that the act can be held criminal." (*Ibid.*) *Maher* concluded adequate provocation means "that *reason* should, at the time of the act, be disturbed or obscured by passion to an extent which might render ordinary men, of fair average disposition, *liable* to *act rashly or without due deliberation or reflection, and from passion, rather than judgment*." (*Ibid.*, first and third sets of italics added.)

13

The development of the law in California tracks this move away from specified categories of provocation to a more generalized standard based on the concept of an ordinary person of average disposition, leaving for the jury whether the given facts show adequate provocation. Before the enactment of the Penal Code in 1872, the Crimes and Punishments Act of 1850 defined voluntary manslaughter as "upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible . . . ." (Stats. 1850, ch. 99, § 22, p. 231.) The act further required that "[i]n cases of voluntary manslaughter there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing." (*Ibid*.)

Thus, although this statute incorporated the concept of a reasonable person, it also limited the adequate provocation to an attempt by the victim to cause serious bodily injury. Our Penal Code subsequently did away with this limitation, simply defining voluntary manslaughter as a killing without malice "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) We recognized in *Logan, supra,* 175 Cal. 45, that this change removed the "injury to the killer" restriction: "In the present condition of our law it is left to the jurors to say whether or not the facts and circumstances in evidence are sufficient to lead them to believe that the defendant did, or to create a reasonable doubt in their minds as to whether or not he did, commit his offense under a heat of passion." (*Id*. at pp. 48-49.) This change was consistent with *Maher*'s observation that jurors were better equipped to make this determination than judges: "Besides the consideration that the question is essentially one of fact, jurors, from the mode of their selection, coming from the various classes and occupations of society, and conversant with the practical affairs of life, are . . . much better qualified to judge of the sufficiency

14

and tendency of a given provocation, and much more likely to fix, with some degree of accuracy, the standard of what constitutes the average of ordinary human nature, than the judge whose habits and course of life give him much less experience of the workings of passion in the actual conflicts of life." (*Maher, supra,* 10 Mich. at p. 222.) In articulating the proper standard, we cited *Maher,* essentially quoting verbatim the standard articulated there, that the fundamental "inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion—not necessarily fear and never, of course, the passion for revenge—to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." (*Logan, supra,* 175 Cal. at p. 49.)

We reaffirmed the *Logan* standard in *People v. Valentine* (1946) 28 Cal.2d 121 (*Valentine*). *Valentine* addressed whether the trial court properly instructed the jury that adequate provocation could not be shown " 'by words only, however opprobrious, nor contemptuous or insulting actions, or gestures without an assault upon the person . . . .' " (*Id.* at p. 137.) This limitation applied at common law and was incorporated into the manslaughter statute under the 1850 Crimes and Punishments Act. (*Valentine,* at pp. 138-139; *People v. Butler* (1857) 8 Cal. 435, 441-443 [approving a similar instruction under the Crimes and Punishments Act].) *Valentine* observed that, although *Logan*'s statement of the proper standard was "a clear and correct statement of the law," cases nevertheless continued to apply the common law limitation that mere words could not constitute adequate provocation. (*Valentine,* at p. 139.) *Valentine* concluded the common law limitation regarding mere words had no application under section 192, subdivision (a), which "omit[ted] the more stringent language of the Crimes and Punishments Act of 1850" (*Valentine,* at p. 141) and was "obviously substantially different"

15

from the former enactment (*id*. at p. 142). In affirming the *Logan* standard, *Valentine* reasoned that "repeal of the statute which incorporated" the common law limitation, "together with enactment of a new law on the same subject with the important limitation deleted, strongly suggests that the Legislature intended a more liberal rule." (*Id.* at p. 143.) After *Valentine*, we have repeatedly quoted the *Logan* standard as a correct statement of law.[9]

The Attorney General's position, that adequate provocation for voluntary manslaughter requires a finding that an ordinary person of average disposition would *kill*, is inconsistent with the *Logan* standard. It is also inconsistent with the conceptual underpinnings of heat of passion as a circumstance which *mitigates* culpability for a killing but does not *justify* it. As *Maher* suggested, society expects the average person not to kill, even when provoked. As Professor Dressler stated, we punish a person who kills in the heat of passion or upon provocation because "[h]e did not control himself as much as he *should* have, or as much as common experience tells us he *could* have, nor as much as the ordinarily law-abiding person *would* have." (Dressler, *Rethinking Heat of Passion: A Defense in Search of a Rationale* (1982), 73 J. Crim.L. & Criminology 421, 467, original italics.) However, if one *does* kill in this state, his punishment is mitigated. Such a killing is not justified but *understandable* in light of "the frailty of human nature." (*Maher, supra,* 10 Mich. at p. 219.) The killing reaction therefore is the *extraordinary* reaction, the unusual exception to the general expectation that the ordinary person will not kill even when provoked.

Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing. The

---

[9]     See *People v. Manriquez* (2005) 37 Cal.4th 547, 584; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1143-1144; *People v. Steele* (2002) 27 Cal.4th 1230, 1252-1253 (*Steele*); *People v. Wharton* (1991) 53 Cal.3d 522, 570; *People v. Rich* (1988) 45 Cal.3d 1036, 1112; *People v. Morse* (1969) 70 Cal.2d 711, 734-735; *People v. Borchers* (1958) 50 Cal.2d 321, 329; *People v. Danielly* (1949) 33 Cal.2d 362, 377-378.

16

proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. To satisfy *Logan*, the anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured.

The Attorney General argues that if provocation is adequate without reference to whether an ordinary person of average disposition would be moved to kill, then the standard would be too low. She asserts that " 'acting rashly' means nothing more than acting hastily or imprudently, without consideration" and "[t]here are countless experiences in everyday life which would cause an ordinary person to act 'rashly,' such as being cut off on the road by an inattentive driver, having coffee spilled on him by a careless waiter, receiving a negative evaluation from a supervisor, or observing an umpire's bad call at his child's little league game." The argument misconstrues the standard. One does not act rashly under *Logan* simply by acting imprudently or out of anger. Even imprudent conduct done while angry is ordinarily the product of some judgment and thought, however fleeting. This is not the type of truly reactive conduct contemplated by the *Logan* standard. This standard does not mean that a defendant does not form malice unless he thinks *rationally* or exercises *sound* judgment. In other words, provocation is sufficient not because it affects the quality of one's thought processes, but because it eclipses reflection. A person in this state simply reacts from emotion due to the provocation, without deliberation or judgment. If an

ordinary person of average disposition, under the same circumstances, would also react in this manner, the provocation is adequate under *Logan*.

The Attorney General's concern that the proper standard is too low is unfounded for two reasons. First, case law and the relevant jury instructions make clear the extreme intensity of the heat of passion required to reduce a murder to manslaughter. This passion must be a " ' " '[v]iolent, intense, high-wrought or enthusiastic emotion' " ' [citation]." (*People v. Breverman* (1998) 19 Cal.4th 142, 163 (*Breverman*).) The emotional response required goes far beyond the type of irritation a person of ordinary disposition would be prompted to feel by the mundane annoyances described above.

Second, *Logan* emphasized that the relevant standard is an objective one. *Logan* recognized that "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man. Thus, no man of extremely violent passion could so justify or excuse himself if the exciting cause be not adequate, nor could an excessively cowardly man justify himself unless the circumstances were such as to arouse the fears of the ordinarily courageous man. Still further, while the conduct of the defendant is to be measured by that of the ordinarily reasonable man placed in identical circumstances, the jury is properly to be told that the exciting cause must be such as would naturally tend to arouse the passion of the ordinarily reasonable man. But as to the nature of the passion itself, our law leaves that to the jury, under these proper admonitions from the court." (*Logan, supra,* 175 Cal. at p. 49.) As the court long ago explained in *People v. Jones* (1911) 160 Cal. 358, 368, "it is not a matter of law but a matter of fact for the jury in each case to determine under the circumstances of the case whether the assault or whether the blow, or whether the indignity or whether the affront, or whatever the act may be, was such as is naturally calculated to arouse the passions, and so

19

lessen the degree of the offense by relieving it from the element of malice."
*Maher* similarly explained that if the standard for provocation was purely subjective, "then, by habitual and long continued indulgence of evil passions, a bad man might acquire a claim to mitigation which would not be available to better men, and on account of that very wickedness of heart which, in itself, constitutes an aggravation both in morals and in law." (*Maher, supra,* 10 Mich. at p. 221.)

The *Logan* standard is further limited by the requirement that a defendant *actually* be motivated by passion in committing the killing. "[I]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter — 'the assailant must act under the smart of that sudden quarrel or heat of passion.' [Citation.]" (*People v. Wickersham* (1982) 32 Cal.3d 307, 327, disapproved on another ground in *People v. Barton, supra,* 12 Cal.4th at p. 201; see also *People v. Moye* (2009) 47 Cal.4th 537, 550 (*Moye*).) Thus, it is insufficient that one is provoked and later kills. If sufficient time has elapsed for one's passions to "cool off" and for judgment to be restored, *Logan* provides no mitigation for a subsequent killing.

This understanding of the *Logan* standard is consistent with the other recognized form of voluntary manslaughter: a killing in the actual but unreasonable belief in the need for self-defense. (§ 192; *People v. Booker* (2011) 51 Cal.4th 141, 182.) Unreasonable self-defense, also called imperfect self-defense, "obviates malice because that most culpable of mental states 'cannot coexist' with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand." (*People v. Rios* (2000) 23 Cal.4th 450, 461.) A killing in imperfect self-defense constitutes, by definition, unreasonable conduct because the belief in the need to defend is not reasonable. The killing is nevertheless mitigated because of the defendant's misguided but

20

good faith belief. Thus, the societal recognition of mitigation is the same. In both heat of passion and imperfect self-defense scenarios, the killer who acts unreasonably commits a crime. Yet the degree of culpability is reduced from murder to manslaughter. Adequate provocation or an unreasonable but good faith belief in the need to defend operates on the killer's mental state to prevent the formation of malice.

To support her argument that provocation is adequate only if an ordinary person of average disposition would kill in response to it, the Attorney General cites California cases, both from this court and the Courts of Appeal, containing different statements of the *Logan* standard. For example, the Attorney General cites several cases that stated or suggested without elaboration that adequate provocation was that which would induce in the ordinary person of average disposition a "homicidal rage" or "deadly passion." These isolated passages did not change the established understanding of the heat of passion principle. The cited cases did not purport to explain or elaborate upon the *Logan* standard, much less change it. The vast majority of the cases cited by the Attorney General properly state or quote the full *Logan* standard, or cite cases that may be traced back to *Logan, supra,* 175 Cal. 45.[10]

_____

[10] See *People v. Carasi* (2008) 44 Cal.4th 1263, 1306; *People v. Koontz* (2002) 27 Cal.4th 1041, 1086; *People v. Lee* (1999) 20 Cal.4th 47, 59; *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1704; *People v. Dixon* (1995) 32 Cal.App.4th 1547, 1551; see also *People v. Avila* (2009) 46 Cal.4th 680, 706 (citing *Steele, supra,* 27 Cal.4th at p. 1252, which quoted *Logan*); *People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1243-1244 (quoting *Steele*).

Two exceptions are *People v. Pride* (1992) 3 Cal.4th 195, and *People v. Superior Court (Henderson)* (1986) 178 Cal.App.3d 516. In rejecting the defendant's claim that the trial court should have instructed on heat of passion voluntary manslaughter as a lesser included offense of murder, *Pride* did not state or quote the relevant standard and concluded the evidence was "insufficient as a matter of law to arouse feelings of *homicidal rage or passion* in an ordinarily reasonable person." (*Pride,* at p. 250, italics added.) For this proposition, however, *Pride* cited only *People v. Balderas* (1985) 41 Cal.3d 144, which quoted *People v. Berry* (1976) 18 Cal.3d 509, 515, and stated that adequate provocation "must be such as would arouse feelings of pain or rage in 'an ordinarily reasonable person' or 'an ordinary man of average disposition.' " (*Balderas,* at p. 196.) Similarly, *Henderson* stated in a footnote: "The concept of 'heat of passion' allows a defendant to reduce a killing from murder to manslaughter only in those situations where the provocation *would trigger a homicidal reaction* in the mind of an ordinarily reasonable person under the given facts and

The Attorney General cites other cases, including out-of-state authorities, which have suggested that provocation is adequate when it stirs in the ordinary person an "irresistible" passion or impulse.[11] None of these cases call our analysis into question. *Hurtado*, which first suggested the "irresistible passion" standard in California, cited no case in support of that standard. (*People v. Hurtado, supra*, 63 Cal. at p. 292.) As such, *Hurtado* hardly calls into question *Maher*'s statement of the relevant standard, which we later approved in *Logan, supra*, 175 Cal. 45 and *Valentine, supra*, 28 Cal.2d 121. In any event, as a short-hand description of the proper standard, these statements are not inconsistent with *Logan*. The relevant passion is "irresistible" in the sense that adequate provocation would induce the ordinary person of average disposition to react from that passion and not from judgment. The passion is "irresistible" to the restraining effect of judgment. This understanding is consistent with *Logan* as we have described it.

The Attorney General maintains that out-of-state authorities suggest the relevant standard is that which would cause in an ordinary person a "resentment to violence"[12] or induces the ordinary person to commit "the act" or "deed."[13] To

circumstances." (*Henderson*, at p. 524, fn. 4, italics added.) For this proposition, *Henderson* cited only *People v. Jackson* (1980) 28 Cal.3d 264, 305, which, in turn, quoted the standard enunciated in *Berry*. Nothing in *Balderas*'s and *Jackson*'s citations of *Berry* suggested any attempt to depart from the *Logan* standard.

[11] See, e.g., *People v. Hurtado* (1883) 63 Cal. 288, 292 (a killing is reduced to voluntary manslaughter "when it is committed under the influence of passion caused by an insult or provocation sufficient to excite an irresistible passion in a reasonable person; one of ordinary self-control"); *State v. Wheat* (La. 1903) 35 So. 955, 960 (adequate provocation is such as " 'to excite an irresistible passion in a reasonable person' ").

[12] See *State v. Rollins* (Me. 1972) 295 A.2d 914, 920-921 ("provocation must be '. . . of that character which would, *in the mind of a just and reasonable man*, stir resentment to violence, endangering life . . . .' " [italics added by *Rollins*]); *Freddo v. State* (Tenn. 1913) 155 S.W. 170, 172 (adequate provocation is "a provocation of such a character as would, in the mind of an average reasonable man, stir resentment likely to cause violence, obscuring the reason, and leading to action from passion rather than judgment"); *Holmes v. State* (Ala. 1890) 7 So. 193, 194 (adequate provocation is that "which would, in the mind of a just and reasonable man, stir resentment to violence, endangering life").

[13] See, e.g., *Dennis v. State* (Md. 1995) 661 A.2d 175, 179 (" ' "The law contemplates the case of a reasonable man—an ordinary reasonable man—and requires that the provocation shall be such as might naturally induce such a man, in the anger of the moment, to commit the deed." ' "); *State v. Watkins* (Iowa 1910) 126 N.W. 691, 692 (same); *Regina v. Welsh* (1869) 11 Cox's Crim. Cases 336, 338 ("The law

22

the extent that these authorities describe a standard contrary to *Maher, supra,* 10 Mich. 212, or *Logan, supra,* 175 Cal. 45, they are not persuasive.

The Attorney General also cites federal cases construing the federal manslaughter statute (18 U.S.C. § 1112(a)), which have suggested adequate provocation is such that would " 'arouse a reasonable and ordinary person to kill someone.' " (*United States v. Wagner* (9th Cir. 1987) 834 F.2d 1474, 1487, quoting *United States v. Collins* (5th Cir. 1982) 690 F.2d 431, 437; see also *United States v. Roston* (9th Cir. 1993) 986 F.2d 1287, 1291 [quoting *Collins*]; *United States v. Eagle Hawk* (8th Cir. 1987) 815 F.2d 1213, 1216 [citing *Collins*].) First, these authorities deal with a different, although similarly worded, statute. Second, "lower federal decisional authority is neither binding nor controlling in matters involving state law." (*Stone Street Capital, LLC v. California State Lottery Com.* (2008) 165 Cal.App.4th 109, 123, fn. 11.) Third, *Collins*, from which this statement derives, cited only *United States v. Chapman* (10th Cir. 1980) 615 F.2d 1294, but that case nowhere suggested that an ordinary person must be aroused to kill. (See *id.* at p. 1300 [describing passion as that which " 'would be aroused naturally *in the mind* of the ordinary reasonable person under the same or similar circumstances' "].)

*E. Instructional Error and Prejudice*

As noted, the version of CALCRIM No. 570 given by the trial court stated in relevant part: "In deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts." The Court of Appeal properly rejected the Attorney General's claim that this instruction did not go far enough by failing to expressly tell the jury to consider the conduct the

contemplates the case of a reasonable man, and requires that the provocation shall be such as that such a man might naturally be induced, in the anger of the moment, to commit the act").

23

provocation might cause in an ordinary person of average disposition and whether such a person would kill in the face of the same provocation. However, the Court of Appeal reasoned the given instruction was potentially ambiguous because it "did not expressly limit the jurors' focus to whether the provocation would have caused an average person to act out of passion rather than judgment" and "allowed, and perhaps even encouraged, jurors to consider whether the provocation would cause an average person to do what the defendant did; i.e., commit a homicide."

We disagree that the instruction is ambiguous as written. Indeed, under ordinary circumstances, the instruction's statement that the jury should consider how a person of average disposition "would react" under the same circumstances would have been unproblematic. As noted, the court instructed that the heat of passion principle came into play if defendant acted under the influence of intense emotion that obscured his reasoning or judgment. Telling the jury to consider how a person of average disposition "would react" properly draws the jury's attention to the objective nature of the standard and the effect the provocation would have on such a person's state of mind.[14]

However, the parties' closing arguments muddied the waters on this point. As the Court of Appeal majority observed, the prosecutor's examples that a reasonable person would not kill if "[y]ou stub your toe" or get "cut off in traffic," although hardly clear, seemed to suggest that the jury should consider the ordinary person's conduct and whether such a person would kill. As discussed, this was not the correct standard.[15] Defense counsel's jury argument countered the

---

[14]    CALCRIM No. 570 has subsequently been revised to replace this language with the following: "In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment." (CALCRIM No. 570 [2008 rev.].)

[15]    The prosecutor's jury argument arguably approached the improper argument condemned in *People v. Najera* (2006) 138 Cal.App.4th 212. In that murder case, the prosecutor argued against a finding of heat

24

prosecutor's statements and suggested the law "doesn't say the provocation would have caused a person of average disposition to kill. . . . [I]nstead the law is provocation that causes a person to act rashly impulsively without thinking." These competing formulations by the advocates may have confused the jury's understanding of the court's instructions.

A majority of the Court of Appeal concluded the potential ambiguity prejudiced defendant. First, the majority observed that the jury's note highlighted the ambiguity but that the trial court's response "did not really focus on the jury's question, and did not really clarify the aspect of the instruction at issue." Second, the majority noted that the prosecutor's closing argument "used the examples of stubbing a toe, getting cut off in traffic, or being jealous to argue that minor provocation is not sufficient to cause a reasonable person to kill someone." The majority reasoned that, although the prosecutor's argument "may not have risen to the level of misconduct, [] it did serve to reinforce the problem with the jury instruction on provocation . . . ." The majority concluded the instructional error was prejudicial under these circumstances. That analysis falls short.

Preliminarily, defendant argues the standard for evaluating federal constitutional errors applies here, i.e., "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman v. California* (1967) 386 U.S. 18, 24.) He asserts the ambiguity introduced into the instructions here deprived him of his federal constitutional rights to a jury trial and due process. We have previously rejected this argument. In noncapital cases, "the rule requiring sua sponte

---

of passion voluntary manslaughter, stating: " 'Would a reasonable person do what the defendant did? Would a reasonable person be so aroused as to kill somebody? That's the standard.' " (*Id.* at p. 223, italics omitted.) Although finding these comments misstated the law, *Najera* concluded the defendant forfeited any prosecutorial misconduct claim by failing to object. (*Id.* at pp. 223-224.) *Najera* did not consider the instructional claim before us.

instructions on all lesser necessarily included offenses supported by the evidence derives exclusively from California law." (*Breverman, supra,* 19 Cal.4th at p. 169.) As such, "in a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v.*] *Watson* [(1956) 46 Cal.2d 818, 836]." (*Breverman,* at p. 178; see *Moye, supra,* 47 Cal.4th at p. 555.) " '[M]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated' in *Watson.*" (*People v. Larsen* (2012) 205 Cal.App.4th 810, 830; see *People v. Whisenhunt* (2008) 44 Cal.4th 174, 214.) "[U]nder *Watson,* a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error." (*People v. Mena* (2012) 54 Cal.4th 146, 162.)

The prejudice analysis of the majority below overlooks an important circumstance: The jury asked for additional guidance and the trial court gave it. It was not reasonably probable that the jury here was misled to defendant's detriment. Although counsel's argument may have created ambiguity about the nature of sufficient provocation, the jury directly requested clarification of the standard. The jury's note pinpointed the issue, inquiring if it should consider whether an ordinary person would "commit the same crime (homicide) or can it be other, less severe, rash acts." The trial court responded with a correct statement of law, that "[t]he provocation involved must be such as to cause a person of average disposition in the same situation and knowing the same facts to do an act rashly and under the influence of such intense emotion *that his judgment or reasoning process was obscured.*" This response properly refocused the jury on the relevant mental state, properly set out in CALCRIM No. 570, and away from whether an ordinary person of average disposition would kill in light of the provocation.

26

Because of the trial court's clarifying instruction, it was not reasonably probable that any possible ambiguity engendered by counsel's argument misled the jury.

Further, the *Watson* test for harmless error "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Breverman, supra,* 19 Cal.4th at p. 177; see *People v. Prince* (2007) 40 Cal.4th 1179, 1267-1268.)

As the Court of Appeal dissent suggested below, evidence of provocation was both weak and contradicted. Defendant testified that he went to the apartment at the victim's invitation. He claimed they only argued because Tempongko was angry with him for being late for their agreed-upon dinner engagement. He denied being angry earlier in the day when he called on her cell phone.

This recitation is not only uncorroborated, it is at odds with a great deal of other evidence. Michael Houtz testified that Tempongko took the cell phone call after J.N. had answered it and told her, "Dad is mad." The call devolved into yelling. Thereafter, Tempongko was very upset. When they arrived at the apartment, Tempongko appeared frightened and did not get out of the car until Houtz drove around the block four times, while she repeatedly scanned the area. Tempongko had an active restraining order barring defendant from the residence. He had violated the order a month before and was arrested. The only noises the neighbor, Maldonado, heard coming from the victim's apartment were a muffled male voice and children screaming. Contrary to defendant's claim that Tempongko was the source of the yelling and hurled insults at him, Maldonado did not hear an adult woman's voice. J.N. testified his mother was "frantic" upon

27

their return home and repeatedly told a caller, "Please don't come to the house." Thereafter, J.N. heard loud banging after which defendant let himself into the apartment. He was angry and began yelling at Tempongko as he entered, quizzing her on where she had been and with whom. J.N., who witnessed the argument and stabbing, did not testify he heard anything about a purported abortion. Defendant's departure from the scene, disposal of the knife, and flight to a foreign country, where he was arrested six years later, all reflected consciousness of guilt. (See *People v. McWhorter* (2009) 47 Cal.4th 318, 376; *People v. Garcia* (2008) 168 Cal.App.4th 261, 292; *People v. Siravo* (1993) 17 Cal.App.4th 555, 563.) Given the strong evidence supporting defendant's murder conviction and the comparatively weak evidence of any legally adequate provocation, a different result was not reasonably probable.

Defendant argues the trial court's response to the jury's question did not resolve the ambiguity because the trial court directed the jury to consider whether the provocation would cause a person of average disposition "to do an act rashly" rather than "to act rashly." Defendant suggests the former formulation continued to improperly focus the jury on the "act" performed, i.e., the act of killing, and whether an ordinary person would commit the act of killing in response to provocation. The trial court's response, taken as a whole, cannot support such a strained interpretation. As discussed, the trial court told the jury to consider whether a person of average disposition would "do an act rashly and under the influence of such intense emotion that his judgment or reasoning process was obscured." This instruction properly focused upon the *rashness* of the act, not on the act alone.

### III. CONCLUSION

We reaffirm today the standard for determining heat of passion that we adopted nearly a century ago. Provocation is adequate only when it would render

28

an ordinary person of average disposition "liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." (*Logan, supra,* 175 Cal. at p. 49.)  We decline the Attorney General's invitation to deviate from this venerable understanding that has been faithfully applied by juries for decades.  Although the former version of CALCRIM No. 570 properly conveyed the *Logan* test, the argument of counsel may have introduced ambiguity. However, the jury asked a clarifying question and the trial court's response dispelled any confusion.

## IV.  DISPOSITION

We reverse the judgment of the Court of Appeal.


**CORRIGAN, J.**



**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**

29

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Beltran
_____

**Unpublished Opinion** XXX NP opn. filed 3/30/11, 1st Dist., Div. 4
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S192644
**Date Filed:** June 3, 2013
_____

**Court:** Superior
**County:** San Francisco
**Judge:** Robert L. Dondero


_____

**Counsel:**

Linda M. Leavitt, under appointmetn by the Supreme Court, for Defendant and Appellant.

Mary Greenwood, Public Defender (Santa Clara) and Michael Ogul, Deputy Public Defender, for California Public Defenders Association, California Attorneys for Criminal Justice and Santa Clara County Public Defender as Amici Curiae on behalf of Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman, Laurence K. Sullivan and Jeffery M. Laurence, Deputy Attorneys General, for Plaintiff and Respondent.

W. Scott Thorpe; Brian Feinberg, Laura Delehunt and Jay Melaas, Deputy District Attorneys (Contra Costa), for California District Attorneys Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Bay Area Legal Aid, Minouche Kandel; Greines, Martin, Stein & Richland, Cynthia E. Tobisman, Kent J. Bullard and Lara M. Krieger for San Francisco Domestic Violence Consortium, California Women Lawyers, California Partnership to End Domestic Violence, Queen's Bench Bar Association and Women Lawyers of Sacramento as Amici Curiae on behalf of Plaintiff and Respondent.

1

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Linda M. Leavitt
PMB 312
5214-F Diamond Hts. Blvd.
San Francisco, CA  94131
(415) 682-7000

Jeffery M. Laurence
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5897