Filed 3/4/14  P. v. Navarro CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUSTO MORA NAVARRO,<br><br>    Defendant and Appellant. | 2d Crim. No. B245484<br>(Super. Ct. No. 2011005398)<br>(Ventura County) |

Justo Mora Navarro appeals from the judgment entered following his conviction by a jury of the second degree murder of Gilberto Aguilera (Pen. Code, §§ 187, subd. (a), 189)[1] and threatening to commit a crime against Javier Viorato that would result in death or great bodily injury (criminal threats).  (§ 422, subd. (a).)  As to the murder conviction, the jury found true an enhancement allegation that appellant had personally and intentionally discharged a firearm.  (§ 12022.53, subd. (d).)  As to the criminal threats conviction, the jury found true an enhancement allegation that appellant had personally used a firearm.  (§ 12022.5, subd. (a).)  For second degree murder with the enhancement, appellant was sentenced to prison for 40 years to life.  For criminal threats with the enhancement, he was sentenced to a consecutive term of 7 years.

---

[1] All statutory references are to the Penal Code.

Appellant contends that (1) the trial court erroneously instructed the jury on the lesser included offense of heat of passion voluntary manslaughter, and (2) he was denied the effective assistance of counsel.  We affirm.

*Facts*

*People's Evidence*

Appellant and Gilberto Aguilera were partners in a flower-growing business.  They had a falling out, and Aguilera sued appellant.  The lawsuit was settled in November 2010.

Appellant was living in a trailer on the premises of another flower-growing business, Don Jose Nursery, which was owned by Jose Valerio.  Valerio knew Aguilera and arranged to meet with him at the nursery on February 1, 2011.  Javier Viorato drove Aguilera to the nursery in Viorato's truck.

Upon arriving at the nursery, Aguilera and Viorato got out of the truck.  Valerio was not present, so they decided to wait for him.  Appellant walked toward Aguilera and Viorato.  He yelled: " 'Hey, . . . you motherfuckers.  You better leave from here because . . . I don't want you guys right here.  You guys better get out right now.' "  Aguilera replied that they were going to stay because they were waiting for the owner and appellant did not have the authority to order them to leave.  Appellant responded, " 'We'll see.' "

Appellant walked away, but a short time later drove his truck to where Aguilera and Viorato were standing.  Appellant stopped the truck and yelled in Spanish through the open window, " 'Are you guys . . . gonna leave or not?' "  Aguilera replied, " 'No because Don Jose [i.e., Jose Valerio] told me to wait for him.' "

Appellant opened the driver's door, got out, and "grabbed something from the back of the truck."  He walked toward Aguilera.  When appellant was about two steps away, he shot Aguilera in the abdomen with a shotgun.  Before the shooting, Aguilera did not threaten appellant and did not try to hit or grab him.  There was no struggle.  After the shooting, Aguilera tried to grab the shotgun but was unable to do so.  He fell down on his

back. Appellant walked to where Aguilera was lying, pointed the shotgun at his head, and said, " 'I told you, motherfucker, to get out of my property.' "

Appellant approached Viorata, pointed the shotgun at his head, and said: " 'You too, motherfucker. I'm gonna kill you to, so you better leave.' " Viorata drove away in his truck.

### Appellant's Testimony

Appellant testified as follows: After the termination of their flower-growing partnership, Aguilera told appellant "[t]hat he was gonna bring his cousins." Appellant interpreted this statement to be a threat. Appellant's business was vandalized, and he believed that Aguilera was responsible for the damage. A man with a knife approached appellant but fled when appellant armed himself with a stake. Appellant believed that Aguilera was involved in the knife incident because he "didn't have problems with anyone, just with [Aguilera]." Aguilera frequently drove by Don Jose Nursery and yelled profanities at appellant. During the night, Aguilera would come onto the nursery's property and shake appellant's trailer while appellant was inside.

On February 1, 2011, Aguilera and Viorata parked a truck on the nursery's property. Appellant drove his truck to where they were parked, rolled his window down halfway, and ordered them to leave. Aguilera and Viorata got out of their truck. Aguilera "lift[ed] up his hands" and said to appellant, " 'Take me out of here if you can.' " Aguilera walked to the driver's side of appellant's truck, tried to open the door, grabbed appellant by his sweatshirt through the half-open window, and tried to pull him out of the truck. Appellant "opened the door and pushed [Aguilera] off."

Appellant did not see Aguilera or Viorata in possession of a weapon, but he was concerned that they had one. He "thought that they were going to fuck [him] up right there." Appellant grabbed a shotgun from under the front passenger's seat of his truck. Appellant and Aguilera struggled over the shotgun. During the struggle, the shotgun fired and Aguilera "just went down." "As soon as the firearm shot, [Viorata] got into his truck" and drove away.

3

Appellant did not point the gun at Aguilera and did not intend to shoot him. He did not have his finger on the trigger. He was "stunned" and "shocked" when the shotgun fired.

*Instructions*

The trial court gave CALCRIM No. 570 on the lesser included offense of heat of passion voluntary manslaughter. Appellant contends that this instruction "contains ambiguity which rendered it misleading and prejudicial." The instruction provided in part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning and judgment; AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is from passion rather than from judgment."

Appellant argues that CALCRIM No. 570 is misleadingly ambiguous because "[i]t can be read to require determination of whether the act of killing was reasonable. It is also vague, in the sense that it does not positively require, or forbid, making the determination [whether the act of killing was reasonable]." Thus, "the jury was allowed to reject a voluntary manslaughter verdict by finding that appellant's conduct [i.e., shooting Aguilera] was unreasonable under the person of average disposition standard."

In other words, appellant is arguing that CALCRIM No. 570 may have misled the jury into believing "that adequate provocation for voluntary manslaughter requires a finding that an ordinary person of average disposition would [be moved to] *kill*." (*People v. Beltran* (2013) 56 Cal.4th 935, 949 (*Beltran*).) In *Beltran* our Supreme Court rejected this standard of provocation: "The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react,* without reflection. . . . Framed another way, provocation is not evaluated by whether the average person

4

would *act* in a certain way: to kill.  Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured."  (*Ibid*.; see also *People v. Najera* (2006) 138 Cal.App.4th 212, 223 ["How the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion"].)

CALCRIM No. 570 is not misleadingly ambiguous.  *Beltran* held that, to reduce a murder to voluntary manslaughter under a heat of passion theory, "[p]rovocation is adequate only when it would render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' [Citation.]"  (*Beltran*, *supra*, 56 Cal.4th at p. 957.)  CALCRIM No. 570 incorporates this language almost verbatim: "The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is from passion rather than from judgment."  The instruction does not "require a finding not only that an ordinary person of average disposition would be liable to act rashly and without reflection, but that such a person would act rashly in a particular manner, namely, by killing."  (*Beltran*, *supra*, 56 Cal.4th at p. 942.)

Our Supreme Court concluded that the former version of CALCRIM No. 570 (2006 version) "properly set[s] out" the "relevant mental state" for heat of passion voluntary manslaughter and is "not ambiguous as written."  (*Beltran*, *supra*, 56 Cal.4th at pp. 954, 956.)  The former version included the following provision: " 'In deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts.' "  (*Ibid*.)  The present version of CALCRIM No. 570 (2008 revision), which was used here by the trial court, "replace[s] this language with the following: 'In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have *reacted from passion rather than from judgment*.' [Citation.]"  (*Id*., at p. 954, fn. 14, italics added.)  Since the former version of CALCRIM No. 570 is a correct statement of the law and not ambiguous, it follows that the same is true as to the present version,

5

which closely conforms to the *Beltran*'s court conclusion that "[t]he proper standard focuses upon whether the person of average disposition would be induced to *react from passion and not from judgment*." (*Id*., at p. 939, italics added.)

In his reply brief, appellant asserts that *Beltran* "held" the former version of CALCRIM No. 570 "to be error due to a latent ambiguity." He maintains that the present version does not dispel this ambiguity. Appellant misconstrues *Beltran*, which found nothing wrong with the instruction. Our Supreme Court noted that a "potential ambiguity" was caused not by the instruction but by "the parties' closing arguments," which "muddied the waters." (*Beltran*, *supra*, 56 Cal.4th at pp. 954-955.) The prosecutor and defense counsel propounded conflicting standards of provocation. "These competing formulations by the advocates may have confused the jury's understanding of the court's instructions." (*Id*., at p. 955.) "Although the former version of CALCRIM No. 570 properly conveyed the [correct] test, the argument of counsel may have introduced ambiguity." (*Id*., at p. 957.) During its deliberations, the jury in *Beltran* wrote a note to the trial court requesting clarification. The court gave an appropriate clarifying instruction; therefore, "it was not reasonably probable that any possible ambiguity engendered by counsel's argument misled the jury." (*Ibid*.)

*Effective Assistance of Counsel: Failure to Request Instruction*

Appellant maintains that he was denied the effective assistance of counsel because counsel failed to request "an instruction, in substance, that how a defendant 'responded to the provocation and the reasonableness of the response is not relevant to . . . heat of passion.' " The standard for evaluating a claim of ineffective counsel is set forth in *Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 80 L.Ed.2d 674]: "First, [appellant] must show that counsel's performance was deficient. . . . Second, [appellant] must show that the deficient performance prejudiced the defense."

To establish deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 688.) Appellant has failed to show that his counsel's representation fell below this standard. As explained in the previous part of this opinion,

6

CALCRIM No. 570 is a correct, unambiguous statement of the law. Thus, there was no need for counsel to request supplemental clarifying instructions. "[C]ounsel need not request unnecessary and duplicative instructions." (*People v. Lucero* (2000) 23 Cal.4th 692, 729.)

*Effective Assistance of Counsel: Concession of*
*Inadmissibility of Misdemeanor Conviction*

Appellant argues that his counsel was ineffective because he conceded that Viorata's misdemeanor conviction was irrelevant and inadmissible. The conviction was for keeping or training a bird with the intent of using it in an exhibition of fighting (cockfighting). (§ 597j, subd. (a).) Appellant contends that the conviction was admissible to corroborate his testimony that Aguilera and Viorata "were engaged in [the] violent, criminal enterprise" of cockfighting. **(AOB 101, 102-103)~** Appellant asserts that the conviction "would have given the defense law enforcement confirmation of Viorato's past violence and hence of [Aguilera's] violence as his companion, which it otherwise lacked."

We need not consider whether counsel was deficient. Even if counsel's performance fell below an objective standard of reasonableness, his deficient performance did not prejudice appellant. To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)

It is not reasonably probable that the result would have been different if Viorata's misdemeanor conviction had been admitted. As appellant notes, Viorata's and Aguilera's involvement in cockfighting was before the jury because of appellant's testimony to that effect. The prior conviction concerned only Viorata, but he had nothing to do with the shooting. According to appellant, the shotgun discharged during a struggle with Aguilera, not Viorata. Moreover, appellant testified that the shotgun had accidentally fired, not that he had intentionally fired it out of fear that Aguilera and Viorata were

7

particularly dangerous because of their involvement in cockfighting.  Finally, another witness - Antonio Valerio - corroborated Viorata's testimony that appellant's shooting of Aguilera was intentional and unprovoked.

*Disposition*

The judgment is affirmed.

NOT FOR PUBLICATON

YEGAN, J.

We concur:

GILBERT, P.J.

PERREN, J.

Patricia M. Murphy, Judge

Superior Court County of Ventura

_____

Dan Mrotek, under appointment by the Court of Appeal. For Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. , Supervising Deputy Attorney General, David F. Glassman, Deputy Attorney General, for Plaintiff and Respondent.