Filed 7/28/21  P. v. Xotoy CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B303336 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA112509) |
| v. | |
| SANTOS LEONEL XOTOY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert Serna, Judge.  Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Zee Rodriguez, Supervising Deputy Attorney General, and Charles J. Sarosy, Deputy Attorney General, for Plaintiff and Respondent.

————————————

Santos Leonel Xotoy suspected Higinio Gonzalez of seeing Xotoy's ex-partner Elvia Lopez Gomez. Xotoy went to where Gonzalez worked, took him to the nearby alley, and shot him to death. Xotoy appeals his murder conviction on three grounds.

## I

The first issue concerns heat of passion, a doctrine that can reduce murder to voluntary manslaughter. This was Xotoy's defense at trial, which the jurors did not accept; instead their verdict was murder. The court gave the jury the right heat-of-passion instruction, but Xotoy argues the *prosecutor* misdescribed the legal standard during her closing argument. Without deciding that point, we reject this argument. Any error was harmless.

## A

*People v. Beltran* (2013) 56 Cal.4th 935, 954–957 (*Beltran*) is the governing case. *Beltran* held a prosecutor "muddied the waters" making the following argument to a properly-instructed jury. (*Id.* at p. 954.) The text of the prosecutor's argument is garbled and tangential, so we italicize some key words.

"And the provocation has to be such that a person of average disposition to act with passion rather than judgment [*sic*]. We would have probably millions more homicides a year if everyone could use words that may be—although I don't disbelieve. I don't agree that this is what happened. It's an illogical interpretation of the facts. *You stub your toe.* You're angry, might cuss a few words. *You don't go out and kill somebody.* [¶] *We've all gotten cut off in traffic.* We say the few choice words, 'Oh, my God.' *We don't* gun the pedal and start trying to hit the car in front of us *to try to kill the person who cut us off.* Can you imagine if that was permissible, 'Oh, my God, I

acted . . . without judgment and rash.  I got so angry.  I was insulted.'  That's not the standard.  It's a reasonable person, and you're all reasonable people and you know that it's illogical that even these words were uttered."  (*Beltran*, *supra*, 56 Cal.4th at p. 943, fn. 5, italics added.)

The *Beltran* decision held the prosecutor's examples—that reasonable people would not kill if they stub their toe or get cut off in traffic—seemed to suggest the jury should consider the ordinary person's conduct and whether such a person would *kill*. (*Beltran*, *supra*, 56 Cal.4th at p. 954.)  This standard is incorrect. (*Ibid.*)  Rather, the proper standard focuses on whether a person of average disposition would be induced to *react from passion and not from judgment*.  (*Id.* at p. 939.)

*Beltran* held the error there was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), which requires a defendant to show a more favorable result was reasonably probable absent the error.  (*Beltran*, *supra*, 56 Cal.4th at pp. 955–957.)

Turning now to this case, Xotoy's prosecutor made these three statements in her closing argument:

"The defense wants you to believe that an average person would do exactly what the defendant did, would act exactly how the defendant acted over a Facebook posting."

"The defendant believes that all 15 of you are going to buy this idea that he was so in love, so desperate, so devastated that he had to kill a man."

"The standard . . . to get heat of passion is, number one, you have to believe that there was enough provocation there, that the defendant was provoked.  Then not only that you have to pass the

standard that an average person would act the same way that the defendant would have acted under passion."

Xotoy's counsel did not object to these statements, and he has therefore forfeited this issue. Moreover, there is no merit to his argument. We assume without deciding these three statements transgressed *Beltran*. Even so, Xotoy has not shown a more favorable result was reasonably probable absent the assumed error.

Following *Beltran*, we examine the evidence in the case under the *Watson* standard.

Two eyewitnesses to the murder testified: Lopez and Xotoy.

1

Lopez testified as follows. She had been in a four-year relationship with Xotoy. They had three children together. On April 20, 2016, Xotoy ended the relationship, saying he did not love her anymore. He made Lopez and the children leave their apartment. They moved in with a downstairs neighbor.

During their relationship, Xotoy called Lopez abusive and demeaning names. Xotoy would sleep in the bed but made Lopez and their children sleep together on a blanket on the floor because Xotoy said Lopez "didn't even deserve to sleep in the bed." After rejecting her, Xotoy told Lopez that she would "need to walk on [her] knees from the door all the way inside the house" to win him back.

Xotoy then demanded Lopez's phone, where he saw messages between Lopez and Gonzalez, one of Lopez's coworkers. Lopez bought Amway products from Gonzalez. Xotoy became suspicious Lopez and Gonzalez had a romantic relationship. Lopez denied it. Xotoy said he would not be made a fool.

4

About a week before the shooting, Xotoy came to Baby Blue Fashion, the clothing factory where Lopez and Gonzalez worked. Xotoy asked Gonzalez whether he and Lopez had a romantic relationship. Gonzalez denied it.

May 9, 2016, was the day of the shooting.

Xotoy called Lopez before she went to work that day. Xotoy was crying and said she and the children could move back into the apartment because he was going to leave for Guatemala. She told him to calm down, take a shower, and go to work.

Fernando Contreras Catarino testified. He also worked at Baby Blue Fashion. That day, Catarino saw Xotoy riding a bicycle back and forth in front of the factory at 6:00 a.m. Xotoy wore a sweatshirt with the hood up. Lopez and Gonzalez both arrived around 7:30 a.m.

Shortly after that, Xotoy phoned Lopez and told her to give the phone to Gonzalez or to tell him to come outside. She refused. About 15 minutes after Gonzalez arrived, Xotoy came into the factory. He walked to the table where Gonzalez was working and repeatedly told him to come outside. The other workers at the table—Catarino and Artemio Gonzalez, who was Gonzalez's cousin—said Xotoy's tone was normal.

Catarino told Gonzalez not to go outside, but Gonzalez said he was going to see what Xotoy wanted.

Gonzalez followed Xotoy out, but on the way stopped at Lopez's workstation and told her to come as well. Xotoy led them to an area near an alley outside the factory.

Xotoy again asked Gonzalez whether he and Lopez had a romantic relationship. Gonzalez said no and that he had no interest in Lopez because she had kids.

Xotoy pulled a gun from his waistband and said, "[I]f you're not going to tell me the truth, then now you're going to tell me the truth."

Xotoy told Gonzalez, "now you're going to die."

Lopez got between Xotoy and Gonzalez. She grabbed Xotoy's wrist and said he would have to kill her first.

Xotoy fired a shot into the ground between Lopez's feet. She moved aside and screamed for help.

Xotoy stepped toward Gonzalez and shot him three times. Gonzalez was hit in the head, wrist, and abdomen.

Gonzalez collapsed and died at the scene.

Xotoy tried to flee. Lopez grabbed Xotoy in a bear hug from behind and yelled for help. Lopez's coworkers arrived and held Xotoy until police arrived.

2

At trial, Xotoy gave a somewhat different account. He claimed Lopez had broken up with him. He admitted they "had words," but denied calling her some of the names she had claimed he called her.

Xotoy had suspected Lopez and Gonzalez were having an affair two months before the shooting because Lopez began mentioning Gonzalez frequently and "had a change in her attitude in [her] relationship" with Xotoy. When he looked through her phone after the breakup, there was an image from Gonzalez with the words: "The distance separates us from me giving you a kiss but the willingness to give you a kiss is right there right now."

About 10 or 12 days before the shooting, Xotoy went to Gonzalez and said he suspected Gonzalez was in a relationship with Lopez. Gonzalez said he just sold Lopez products, but Xotoy

countered that the messages were personal, not about sales. Xotoy said, "leave my wife alone." Xotoy said Gonzalez's response was, "I don't give a fuck about your marriage," or "I don't give a fuck what you're telling me." Xotoy left, convinced Lopez was having an affair with Gonzalez.

Although Xotoy initially testified Lopez had not confessed to an affair with Gonzalez, further questioning from his counsel prompted him to change his answer and testify Lopez confessed to the relationship the night before the shooting. Xotoy was upset because he thought he was losing his family.

May 9, 2016, was the fatal day.

Xotoy went into the Baby Blue Fashion factory that day because he wanted to tell Gonzalez "to leave [his] woman alone." Xotoy brought a gun because he feared Gonzalez; the last time they spoke, Gonzalez suggested they fight.

Lopez and Gonzalez followed Xotoy out of the factory. She told Gonzalez, "Don't tell this man anything." Lopez and Gonzalez were smiling and laughing with each other behind him. Xotoy thought they were laughing at him.

Gonzalez spoke to Xotoy: "[L]et's see. Come. Are you scared? Where do you think you are going?"

Xotoy did not describe Gonzalez's tone, nor did Xotoy claim Gonzalez accompanied his words with threatening gestures or a taunting posture. Yet Xotoy testified he took these words as a challenge or a threat.

Xotoy testified he felt angry but he remained "in full control" of himself.

Then Gonzalez told Xotoy, "It's not my fault. She's the one that texts me. She calls me. And it seems to be that [Lopez] has

found what she wants in me."  Gonzalez added, "I have what she wants."

No evidence established or suggested Gonzalez supposedly made these statements in anything besides an ordinary conversational tone.  Xotoy did not claim Gonzalez was shouting or was emotional in any way.

Xotoy "became angry, humiliated, jealous and . . . [his] mind was like blocked."

Xotoy drew his gun and asked Gonzalez "for respect, for him to respect my pain."

When Xotoy pulled the gun, Lopez grabbed his hand.  She "lowered my hand and a shot was fired due to the fact I was struggling with her."  Xotoy illustrated the struggle on the stand by pulling his right arm downward.  The shot hit the ground between Lopez's feet.

Xotoy became angrier because Lopez was defending Gonzalez.  He felt angry, stupid, and humiliated.  "[H]ow far I had gone for her, how far I had gone with that pain."  He saw a vision of one of his children.  "My vision was darkened.  My mind went completely dark and I lost my—I lost all memory and I lost control."

Xotoy shot Gonzalez three times.

Xotoy admitted he did not tell the police about the statements he claimed Gonzalez made.  When asked whether the reason he was "coming up with those statements today is because [he was] in trial in front of these jurors," Xotoy answered yes.

B

The assumed error was harmless under *Beltran* and *Watson*.

The "evidence of provocation was both weak and contradicted." (*Beltran*, *supra*, 56 Cal.4th at p. 956.) A reasonable person would not "be induced to react from passion" rather than from judgment (*id.* at p. 939) because Lopez and Gonzalez were talking and laughing with each other while walking behind the reasonable person.

Xotoy claimed he took it as a threat when Gonzalez said "[L]et's see. Come. Are you scared? Where do you think you are going?" A reasonable person would not take these words as a threat. These words would not prompt a reasonable person to react from passion instead of judgment.

When Lopez said, "Don't tell this man anything," Xotoy felt "a lot of anger, but I was also in full control of myself." In other words, Xotoy effectively testified these words did not make him react from passion instead of judgment.

Xotoy testified the triggering event was Gonzalez telling him the affair with Lopez was not Gonzalez's fault, because it was Lopez who had texted and phoned him, because Gonzalez had what Lopez wanted. Xotoy drew his weapon, prompting Lopez to try to push the barrel toward the ground.

Lopez's action legally cannot have been provocation for Xotoy to shoot Gonzalez; Lopez was not Xotoy's victim. (*People v. Verdugo* (2010) 50 Cal.4th 263, 293 [the provocation must be caused by the victim; victim must taunt the defendant or otherwise initiate the provocation].)

Xotoy's claim is, when a man hears his romantic rival say she wants me not you, that suffices to drive a reasonable person to react in passion rather than from judgment. No defendant, however, may set up his own standard of conduct and excuse himself because his passions actually were aroused unless the

9

circumstances are sufficient to arouse the passions of the ordinarily reasonable person. (*Beltran, supra*, 56 Cal.4th at p. 950.) These circumstances fall short.

"This recitation is not only uncorroborated, it is at odds with a great deal of other evidence." (*Beltran, supra*, 56 Cal.4th at p. 956.) Xotoy said he would not be made a fool. Before the shooting, he told Lopez he was going back to Guatemala. Xotoy took a gun and traveled to Gonzalez's workplace to confront Gonzalez. Xotoy arrived early: 90 minutes before the workday started. When Gonzalez arrived, Xotoy summoned him from the factory to the nearby alley. Xotoy was calm. In the alley, Xotoy told Gonzalez, "now you are going to die." After his arrest, Xotoy spoke to police but did not relate Gonzalez's supposedly provoking words. At trial, Xotoy agreed he was "coming up with those statements [Xotoy was attributing to Gonzalez] because [Xotoy was] in trial in front of these jurors."

Xotoy has not discharged his burden of showing a more favorable result was reasonably probable absent the error we have assumed. (See *Watson, supra*, 46 Cal.2d at p. 836.)

II

Xotoy's second argument is his counsel provided ineffective assistance of counsel by failing to raise any argument at the sentencing hearing. This argument fails because Xotoy does not show prejudice.

Xotoy argues that, because the trial court had discretion to strike the firearm allegations under Penal Code sections 1385 and 12022.53, subdivision (h), his counsel should have filed a brief or provided argument. However, the trial court was aware of its discretion and stated it found no reason to exercise it. Xotoy does not identify any arguments or factors his counsel

10

could have raised to induce the trial court to exercise its discretion.  Xotoy has not shown prejudice.

III

Xotoy makes an argument pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157.  He concedes he did not object to the fines and fees in the trial court.  He thus forfeited this argument. (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1155.)

**DISPOSITION**

We affirm the judgment.


WILEY, J.


We concur:



GRIMES, Acting P. J.



STRATTON, J.