Filed 7/15/24  P. v. Renfroe CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>JAMES DAVID RENFROE,<br><br>  Defendant and Appellant. | G063292<br><br>(Super. Ct. No. RIF2102015)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside, Dean Benjamini, Judge.  Affirmed.

Kenneth H. Nordin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant James David Renfroe appeals from a judgment following a jury trial in which he was found guilty of committing various sex crimes against two minors, involving two separate incidents.  The jury was given an instruction consistent with Evidence Code section 1108[1] and *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*) that permitted the jury to draw an inference that Renfroe had a propensity to commit the other sex crimes charged in this case if it found that any charged sex crime had been proven beyond a reasonable doubt.  Renfroe contends it was error to give this instruction without first performing a section 352 analysis.  We agree that the court seems to have been unaware of its discretion to reject the instruction, and thus it failed to exercise its discretion.  However, we conclude the error was harmless and affirm the judgment.

## FACTS

### 1. *Thirty-three year-old Renfroe engages in a sexual relationship with 16-year-old JD1[2]*

In 2020, Renfroe sold marijuana products online as the self-styled "the main plug" (a "plug" is a term for a drug dealer).  Sixteen-year-old JD1 was a high school junior and cheerleader.  She lived with her parents and older sister.

JD1 met Renfroe through his online drug sales.  JD1, who had been smoking marijuana since middle school, first purchased marijuana from

---

[1] All further statutory references are to the Evidence Code unless otherwise stated.

[2] In order to protect the privacy of the victims, who are both minors and victims of sex crimes, we refer to them as JD1 (Jane Doe 1) and JD2 (Jane Doe 2).

2

Renfroe in October of 2020. JD1 met Renfroe in person "around the corner by [her] house." They started communicating through "Snapchat," a social media platform, and developed a friendship of sorts. JD1 started hanging out with Renfroe in person. They spent a lot of time together.

By November 2020, JD1 had developed romantic feelings for Renfroe, and they started dating. JD1 did not have a car or a driver's license so Renfroe would pick her up from her house. They went out to dinner, and they would go shopping. Renfroe also dropped her off and picked her up at the high school, including from her cheerleading practice. He did this a few days a week. They did not go to Renfroe's home because he was married. JD1 fell in love with Renfroe. He made her feel special, told her he had feelings for her and not his wife, and JD1 believed that they would get married.

JD1 told Renfroe that she was 16 years old less than a month into their dating relationship and Renfroe told her that he was 33, sometime in November or December 2020. Renfroe expressed surprise that she was 16 but did not say anything or suggest that they should not date because of her age. JD1's parents knew that she was dating but they did not know it was Renfroe.

On January 29, 2021, JD1's mother discovered marijuana in her bedroom, and they got into an argument. JD1's mother went into JD1's room to ask her to join her doing some errands when she smelled marijuana and saw it on JD1's dresser. JD1's mother took it and JD1 tried to take it back from her. JD1's sister stepped in and took the bag from JD1 and handed it over to their mother. JD1's mother then left to complete an important errand and contacted her husband.

3

Meanwhile, JD1 called Renfroe to pick her up. When JD1's mother returned home from her errand she noticed a white Tesla pulling away as she pulled in. Then JD1 walked out through front door of her house with a bag in her hand. She told her mother that she was leaving as she was speaking to someone on the phone. JD1's mother could hear her ask the person on the phone, "Where are you?" and saw her daughter walk a few houses down the street. The car she had previously noticed, the white Tesla, had returned. JD1's mother was a few steps behind JD1 and now on the phone with her husband. When JD1 started to get into the Tesla her mother tried to pull her out of the car. JD1's mother physically held the car door open and put her body between the car door and car so the door could not close. She told JD1 and Renfroe that she was going to call the police and she took photos of them in the car.

JD1's mother had never seen Renfroe before and she had no idea that JD1 had been dating a 33-year-old man. JD1's mother repeatedly yelled at Renfroe, "She's only 16." She told Renfroe, "Do not take her" and said that she was "going to get in the vehicle too." Renfroe just looked directly at JD1's mother and did not say anything. JD1 began to kick her mother out of the way and the car sped away. JD1's mother immediately called 911, relaying what happened including that she told Renfroe that her daughter was 16 years old. She also provided the police with the pictures she took, and they were able to identify Renfroe using facial recognition software.

To avoid detection by the police, Renfroe stopped at a parking lot to switch cars to a truck that he also drove. Renfroe and JD1 then went to a hotel in Riverside where they stayed for three or four days. This was the first time that JD1 had intercourse with Renfroe.

4

After staying another night at a different hotel, JD1 moved into an apartment that Renfroe rented for her. She lived at the apartment from February through May or June of 2021. Renfroe was there most days out of the week, but he would leave at night to return to his family home. JD1 estimated that they engaged in intercourse weekly and they similarly engaged in oral sex with each other and Renfroe digitally penetrated her vagina. Other than his wife, JD1 considered them to be in an exclusive dating relationship.

JD1 also helped Renfroe with packaging and selling drugs. Renfroe paid her. Renfroe was growing mushrooms in the apartment. JD1 also accompanied Renfroe when he sold mushrooms. They smoked marijuana together.

During this time, JD1 continued to attend school. Her social media account, which Renfroe followed, had pictures of her cheering at various high school games including some in April when she was still living in Renfroe's apartment.

## 2. *Renfroe tried to engage in sexual activity with 13-year-old JD2 and obtained nude photos and videos of her genitalia*

In May 2021, while Renfroe still had JD1 in the apartment and his wife and son at home, he initiated contact with 13-year-old JD2. JD2, who was born in 2008, had just turned 13 years old and was in 7th grade. At the time, she had a "Snapchat" account, which was a social media platform where she could text or "snap" others and add random people online. JD2 posted pictures of herself and where she went to let people know where she was. She would accept friend requests from random people and begin

chatting with them. Most of the people that JD2 chatted with were around her age or younger. "It was really random if someone was older."

Sometime during the first week of May 2021, Renfroe contacted JD2 through Snapchat. With a username of "the main plug" he added her through "Quick Add" as a friend and started chatting with JD2. When JD2 was first contacted by Renfroe, she thought he was someone her age. She did not have a particular intention when communicating with him. Because JD2 did not know what the reference to plug meant she asked a friend who told her that it meant a drug dealer. Renfroe's posts depicted vape pens, edibles and roll ups. JD2 asked Renfroe his age and he told her he was 34 years old.

Renfroe's Snapchats started out just being kind to JD2. He chatted and asked JD2 about herself for a couple of days before asking whether she wanted to buy drugs. He asked, "Do you want to buy the stuff I have on my story?" JD2 could see on his Snapchat "story" that he had various marijuana products. She asked him whether he sold to 13-year-olds because she was 13. Renfroe said that he did not mind selling to any age. JD2 had never handled or used these products before. Although she knew what marijuana was and had seen people smoke marijuana, JD2 had not been personally interested in marijuana until Renfroe offered. She also knew that she was not old enough to buy marijuana because she was 13 years old and that was why she asked if he sold to her age group.

JD2 initially declined because she did not have money to pay Renfroe. When she told him so, he responded, "There's other ways you can pay me." When JD2 asked Renfroe how, he told her by having sexual relations with him, sending him nudes, or giving him oral sex like other girls did. JD2 thought about it and decided she would like to meet up with Renfroe. She did not agree to have sex (intercourse) with him, but she did

6

agree to perform oral sex for a vape pen.  Renfroe indicated that either was fine with him, that others had performed oral sex and that it felt good.

JD2 and Renfroe did not make any specific plan at that point, but Renfroe contacted her the next day by text and asked when they would meet up.  Around this time, they also discussed where they would meet and agreed it would be at a mall on May 17, 2021.  Renfroe broached the possibility of a threesome with his "homegirl."  Thereafter, JD2 changed her mind about oral sex and offered to provide "nudes," meaning she would send Renfroe nude pictures of herself.

Renfroe agreed to the offer of nude photos but said it would have to be "a lot of pictures to pay it off."  He directed what kind of pictures and videos JD2 should take.  She took the photos of herself in mid-May 2021.  After JD2 sent Renfroe photos of herself, he agreed to deliver the vape pen but said that she would need to get a battery.  JD2 did not know what Renfroe meant at first and a friend explained.  Renfroe told her that she would have to send more photos in order to get the battery for "free."  JD2 sent Renfroe more photos.  In all, JD2 sent photos of herself completely nude, specific nude portions of her body, including her genitalia and of herself in various sexual poses specified by Renfroe.  Renfroe also insisted that she video herself masturbating "and to make sure it was really wet."  Renfroe asked for and obtained seven videos of JD2.  Renfroe, in turn, sent JD2 an unsolicited photo of his penis.  JD2 did not want to see his penis.  Renfroe also sent two face shots, one with him wearing sunglasses and the other without sunglasses.

The day after, on May 14, 2021, Renfroe drove to JD2's home to deliver the vape pen and the charger.  The plan was for him to leave it on the lawn in front of JD2's home because JD2 told Renfroe that she lived with her

7

parents and that she did not want to get caught. However, when Renfroe tossed the vape package out of his car it landed on the street not JD2's lawn. Renfroe texted JD2, "hurry up and pick up the pen so that you don't get caught by your parents." JD2 retrieved the unopened vape pen and charger from the street in front of her home and hid it in her room. She did not open it. She knew that if her mother found out about it she would be in trouble. Renfroe texted her later to confirm her receipt, which she did.

Thereafter, JD2 became scared because Renfroe continued to ask her "if [she] wanted to meet up still." She was worried that he would come by her home, so she told her mother what had happened. Her mother, in turn, contacted her father, although she did not tell him how JD2 paid for the vape pen.

The next morning, JD2's father, who thought Renfroe wanted money, posed as JD2 on her phone and texted Renfroe, "How much do I owe you?" Renfroe responded, "Aren't we meeting up?" JD2's father suggested Sunday or Monday. During this exchange, Renfroe explained why he did not want to communicate with his phone number, noting he had to stay "lowkey on snap" because if JD2 texted him on his number "I'll get caught up." Renfroe also became suspicious that he was not texting with JD2 and asked for a picture of her with the phone. After being reassured, Renfroe asked JD2 to "send pics." In the text exchange Renfroe also volunteered, "I still have some of those pics you sent me. I'm looking forward to it."

Meanwhile, JD2's mother also contacted the police. They, in turn, took control over JD2's phone. The police, posing as JD2, agreed to meet with Renfroe at 4:30 p.m., on Sunday after she finished her homework. Renfroe expressed concern about her parents taking her phone and someone "knowing about this shit." Renfroe confirmed the plan to "meet up so [she] could give

[him] head," and offered to do the same for her. He also offered to pick JD2 "around the corner from [her] house" but the police texted that she would walk there. They agreed to meet at the top of a parking structure near a movie theatre at a mall.

Renfroe initially drove up to the top of the parking structure where there is nothing to do except park. He made a slow U-turn, drove down to a lower level, and parked his car. He texted JD2 and told her that he parked in a lower level because he had seen a cop. The police located Renfroe in a white Tesla and arrested him.

A search of Renfroe's car uncovered a firearm, a loaded nine-millimeter semi-automatic handgun, pre-rolled marijuana cigarettes, marijuana oil, edibles, marijuana vape pen cartridges, psilocybin mushrooms, and a scale. Additionally, the officers recovered Renfroe's phone with the main plug's account. The photo of Renfroe's penis sent to JD2 appeared to have been taken from inside the Tesla.

A search of Renfroe's home pursuant to a warrant uncovered approximately two pounds of psilocybin mushrooms and panels of processed marijuana in various forms, such as concentrates, vape pens, vape chargers, and pre-rolled cigarettes. The quantity and packaging were consistent with sales. The pictures of JD2 were the only child pornography found in Renfroe's possession.

3. *After his release from custody, Renfroe continued to engage in sexual activity with JD1*

In May 2021, JD1 learned from a friend of Renfroe's that Renfroe had been arrested. When Renfroe was released, he told her that "he was caught selling drugs." He said that he got caught selling to a girl but did not

9

mention her age or that it involved nude photos. Later, Renfroe told her that girl was younger but did not say how old she was. He maintained that he did not know. JD1 also understood eventually that something was sexually promised for the drugs. She was disappointed and was packing to leave when Renfroe told her to pack up all of her belongings because he was going to take her home out of concern the police might come to the apartment. Renfroe explained that the police were at his home with his wife.

At this point, Renfroe and JD1's relationship began to unravel. On June 5, 2021, at the instigation of her sister, JD1 demanded $20,000 from Renfroe or she would go to the police station and report him. She did not want to threaten Renfroe, but she was upset and confused. She did not like being away from Renfroe and continued to have feelings for him. A text exchange followed where JD1 pointed out that Renfroe knew that she was underage and Renfroe countered that this was not her and that she had a fake identification. He then complained, "All for money. I made a mistake." He then threatened JD1 by pointing out that she tried to hide evidence for him, and he had never told her to do that. JD1 had tried to hide all the marijuana and mushrooms that were at the apartment at a friend's house.

After the text conversation, JD1's sister encouraged her to go to the police, to protect others. JD1 entered into an immunity agreement over her attempt to extort money from Renfroe and her participation in his drug sales operation. She agreed to testify truthfully and maintained that she did.

The jury returned a mixed verdict. On count 1, contacting a minor with the intent to commit a lewd or lascivious act on a child under 14 years of age (Pen. Code, §§ 288.3, 288, subd. (a)), the jury found Renfroe not guilty. On count 3, attempted lewd or lascivious act with a child under 14 (Pen. Code, § 288, subd. (a)), the jury found Renfroe not guilty. On the

10

remaining counts, the jury found Renfroe guilty. Those included: count 2, going to meeting with minor for lewd purposes (Pen. Code, § 288.4, subd. (b)); count 4, possession of controlled substance for sale (Health & Saf. Code, § 11378); count 5, using a minor to perform prohibited act (Pen. Code, § 311.4, subd. (c); count 6, carrying a loaded firearm (Pen. Code, § 25850 subd. (c)(7)); count 7, unlawful sexual intercourse with a minor more than three years younger (Pen. Code, § 261.5); count 9, oral copulation with a person under 18 (Pen. Code, § 287, subd. (b)(1)); and count 10, sexual penetration with a person under 18 (Pen. Code, § 289, subd. (h)).[3]

The court selected count 2 as the principal count and sentenced Renfroe to the middle term of three years in state prison. On each of the remaining counts, the court imposed one-third of the middle term of two years, which was eight months, to run consecutive to the principal term. The court also imposed a two-year enhancement on count 7 pursuant to Penal Code section 12022.1 (crime committed while released from custody), run consecutively. The total sentence was 8 years 4 months. Renfroe appealed.

## DISCUSSION

Renfroe raises a single issue of instructional error on appeal. In particular Renfroe claims it was error to provide the jury an instruction based on CALCRIM No. 1191B, which is in turn based on section 1108. Section 1108 provides, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the

---

[3] Prior to trial, the court dismissed count 8, attempting to dissuade a witness from reporting a crime.

evidence is not inadmissible pursuant to Section 352." (*Id.*, subd. (a).) Section 1108 is an exception to the usual rule that propensity evidence is inadmissible. (§ 1101, subd. (a); *Villatoro, supra,* 54 Cal.4th at pp. 1159-1160.) The twist here is that the predicate act relied on to prove propensity is *itself* one of the charged crimes in the present case. In other words, instead of relying on a previous conviction or bad act, the jury was permitted to rely on any one of the sexual offenses proven in this case to establish a propensity to commit the other sexual offenses charged in this case.

The instruction at issue reads as follows:

"The People presented evidence that the defendant committed the crimes of Attempted Lewd or Lascivious Act: Child Under 14 Years (Pen. Code §§ 664/288(a)); Using a Minor to Perform Prohibited Act (Pen. Code § 311.4(c)); Oral Copulation With Person Under 18 (Pen. Code § 287( b)(1)); and Sexual Penetration With Person Under 18 (Pen. Code § 289(h)) charged in Counts 3, 5, 9, and 10.

"If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sex offenses charged in this case.

"If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove each charge and allegation beyond a reasonable doubt." (CALCRIM No. 1191B.)

12

Renfroe contends the court erred by providing this instruction without first conducting a section 352 analysis, as set forth in *Villatoro, supra,* 54 Cal.4th 1152.[4]

In *Villatoro*, a four to three decision, the court considered whether section 1108 permits the use of *charged* sexual offenses as predicate offenses to prove propensity to commit other charged sexual offenses (i.e., the same situation we have here). (*Villatoro*, *supra*, 54 Cal.4th at p. 1160.) Concluding that it does, the majority relied on the fact that the statute simply refers to "another" sexual offense and draws no distinction between charged and uncharged offenses. (*Id.* at pp. 1160-1161.) The Attorney General argued that section 1108's reference to section 352 was an implicit distinction between charged and uncharged offenses, since evidence of charged offenses cannot be excluded under section 352. (*Villatoro*, at p. 1162.) In rejecting that argument, the *Villatoro* majority concluded that the court has discretion under section 352 to prohibit the jury from making a propensity inference. (*Villatoro*, at p. 1163 ["nothing precludes a trial court from considering section 352 factors when deciding whether to permit the jury to infer a defendant's propensity based on this evidence"].) "'Even where a defendant is charged with multiple sex offenses, they may be dissimilar enough, or so remote or unconnected to each other, that the trial court could apply the criteria of section 352 and determine that it is not proper for the jury to consider one or more of the charged offenses as evidence that the

_____

[4] Section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

13

defendant likely committed any of the other charged offenses.'" (*Id.* at p. 1163.)

The problem here, Renfroe insists, is that the court did not seem to be aware of its discretion under section 352. When the prosecutor requested that CALCRIM No. 1191B be given, the court commented, "I'll just say I'm not a big fan of 1191B, of using [section] 1108 . . . in the same case, but that's the way the law is." "If that's going to be argued, I think this is an appropriate instruction . . . ." These comments suggest that the court felt that its hands were tied. The court did not engage in any sort of analysis to determine whether CALCRIM No. 1191B was appropriate in light of the circumstances of the present case. "A court *necessarily* abuses its discretion when it fails to exercise its discretion at all . . . ." (*People v. Choi* (2021) 59 Cal.App.5th 753, 766.)

The Attorney General contends the court implicitly exercised its discretion under section 352, relying primarily on *Villatoro*. There, the trial court had not explicitly analyzed giving an instruction under the rubric of section 352. (*Villatoro, supra*, 54 Cal.4th at p. 1168.) However, the trial court had cited a case in which a section 352 analysis was required. That was sufficient for our Supreme Court to find that the trial court had implicitly considered section 352: "'[W]e are willing to infer an implicit weighing by the trial court on the basis of record indications *well short* of an express statement.'" (*Villatoro*, at p. 1168.)

The record in the present case, however, differs significantly from the record in *Villatoro*. Here, the court's statements suggest it was unaware of its discretion to deny the requested instruction. And unlike *Villatoro*, the court cited no cases that could implicitly suggest the court had performed the appropriate analysis. Accordingly, the court erred.

14

Nevertheless, we conclude the error was harmless.  For instructional errors that do not amount to a deprivation of due process, we review the error under the standard prescribed by *People v. Watson* (1956) 46 Cal.2d 818, 836, pursuant to which we reverse only if it is reasonably probable that the appellant would have obtained a better result in the absence of the error.  (*People v. Beltran* (2013) 56 Cal.4th 935, 955.)

There is nothing in the record to suggest that this instruction made any difference in the outcome of the trial.  Multiple aspects of the record support this conclusion.

The actual discussion of the propensity jury instruction by the prosecution was very brief, occupying just four lines in the reporter's transcript.  It was not mentioned at all by defense counsel, nor was it mentioned by the prosecutor in rebuttal.

The instruction itself made clear that, even if the jury elected to draw an inference of propensity, such an inference was not sufficient to prove guilt.  It properly informed the jury that the prosecutor still had the burden of proving the elements of each crime beyond a reasonable doubt.

Rather than focusing on this instruction, the focus of the parties' arguments was on the credibility of the witnesses who claimed to have told Renfroe the ages of the minors (i.e., JD1, JD1's mother, and JD2).  The jury did not ask any questions about the instruction.

Finally, and perhaps most importantly, the particular concern of failing to perform a section 352 analysis is that the jury could be inflamed by otherwise inadmissible evidence (or, in this case, inappropriate inferences).  (*People v. Williams* (2013) 58 Cal.4th 197, 270 [""The 'prejudice' referred to in . . . section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little

15

effect on the issues""].)  Here, however, the jury seems to have been highly discerning.  Far from throwing the book at Renfroe, it found him not guilty on the more serious charges involving sexual crimes against a minor under 14 years old.[5]  This suggests the jury was not inflamed by emotion, but instead closely parsed the evidence and the requirements of each charge and held the prosecution to its burden of proof.  Accordingly, the court's error in failing to perform a section 352 analysis was harmless.

## DISPOSITION

The judgment is affirmed.


SANCHEZ, ACTING P. J.

WE CONCUR:


DELANEY, J.


GOODING, J.

---

[5] The middle term sentence for a violation of section 288, subdivision (a), is six years, which is double the primary term he actually received.

16