Filed 1/15/26  P. v. Myrick CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D085127 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD298526) |
| ROBERT MYRICK, | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, Jeffrey F. Fraser, Judge.  Affirmed.

Jeanine G. Strong, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Robin Urbanski, Acting Assistant Attorney General, Arlene A. Sevidal, Randal D. Einhorn, and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

Robert Myrick appeals from a judgment after a jury convicted him of two counts of assault by means of force likely to produce great bodily injury

(Pen. Code,[1] § 245, subd. (a)(4)) and one count of battery with serious bodily injury (§ 243, subd. (d)) and found true an enhancement allegation for personal infliction of great bodily injury (§ 12022.7, subd. (a)). The sole issue he raises on appeal is that the trial court erred in denying his pretrial request for mental health diversion under section 1001.36. We find no error and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Because the only issue on appeal is the denial of Myrick's pretrial request for mental health diversion, we summarize the facts based on the exhibits submitted by the parties on this issue. These exhibits consisted of the preliminary hearing transcript, police reports, and the report of Dr. David DeFrancesco.

A. *Assault of Victim J.B.*

On the evening of March 31, 2023, Myrick was with a group of several other men on a street corner near Petco Park in downtown San Diego. J.B. was walking nearby when he and Myrick got into a yelling match. Myrick punched J.B. in the face several times. After the last punch, J.B.'s body went stiff and he fell to the ground. J.B. hit the back of his head on the curb and was knocked unconscious. He began bleeding from a three-inch laceration to the back of his head. After police arrived, multiple witnesses identified Myrick as the perpetrator. In a search incident to arrest, the police found a glass pipe for smoking methamphetamine in his possession.

B. *Assault of Victim R.S.*

Later that same night, Myrick and inmate R.S. were both in the booking area of the county jail. The booking clerk asked R.S. how many times he had been arrested. After R.S. said it was his first time, Myrick

---

[1] Further undesignated statutory references are to the Penal Code.

threw his shoulders back, clenched his fists, and said to R.S. in a threatening manner, "What's up?" According to R.S., Myrick had a "wild look in his eye."

After they both completed the booking process, Myrick and R.S. were placed in the same holding cell. R.S. sat down on a bench inside the cell. Within 90 seconds, Myrick walked up to him and started punching him in the face and head about 12 times. R.S. tried to cover his face and head with his arms and did not fight back. R.S. suffered multiple fractures of the bones in his head and face, including orbital and nasal fractures.

C. *Pretrial Request for Mental Health Diversion*

Myrick was charged with assault by means of force likely to produce great bodily injury for each of the two assaults (§ 245, subd. (a)(4); counts 1 & 3) and battery with serious bodily injury for the assault on J.B. (§ 243, subd. (d); count 2.) As to count one, the information also alleged that Myrick personally inflicted great bodily injury on J.B. (§ 12022.7, subd. (a).)

Before trial, Myrick filed a request for mental health diversion under section 1001.36. In support, Myrick submitted a psychological evaluation conducted by Dr. DeFrancesco.

According to Dr. DeFrancesco, Myrick qualified for mental health diversion because: (1) he had qualifying mental disorders, specifically unspecified schizophrenia spectrum and other psychotic disorder and substance use disorders; (2) his mental disorders were significant factors in the commission of the charged offenses; (3) his mental disorders would respond to mental health treatment if he followed the recommendations of his treatment team; and (4) he could be treated in the community without engaging in acts of violence.

Dr. DeFrancesco's report described Myrick's background and symptoms. Myrick was 30 years old. As a child, his mother was in and out

3

of prison mostly for drug-related offenses.  He and his older brother were very close and started to get into trouble together as juveniles.  Myrick "went into the juvenile justice system where he learned that he had to fight or he would be victimized."  He also started using drugs.  He used all sorts of drugs over the years, continuing until the time of his arrest.  He had trouble controlling his usage, which increased during times of distress.

According to Dr. DeFrancesco's report, Myrick was first arrested at age 14 for carrying a weapon in Texas.  His other juvenile offenses included assault, obstruction, and robbery.  He spent time in juvenile confinement facilities.[2]  When Myrick was 18 years old, he was convicted of robbery in Texas and sentenced to adult prison.[3]  He was released about eight years later.  After his brother was murdered, he started to have emotional problems, began using drugs more regularly, and "started to fear people whom he did not know."  "He got into trouble because he might carry a weapon for self-protection and when he was threatened he would fight back."

Dr. DeFrancesco explained that Myrick's mental health symptoms included hearing voices.  Myrick had heard voices periodically over the years but kept it from others because he did not want to go to the "crazy house." At the time of the psychological evaluation, he was still hearing voices "that commented on him and his situation" and he was taking an antipsychotic drug that was "partially effective."

---

[2]   Dr. DeFrancesco's report does not indicate which of Myrick's juvenile offenses resulted in an adjudication or commitment.  The probation report does not include any information about Myrick's juvenile criminal history, which apparently occurred in Texas.

[3]   Though not before the trial court at the time of its diversion ruling, the probation report indicates that the Texas robbery conviction was for aggravated robbery with use of a firearm.

4

Regarding the charged assault against J.B., Myrick told Dr. DeFrancesco that "he was hanging out with some others and that there was a lot of activity on the street. He recalled it being loud and there were a lot of unfamiliar people. He admitted that he was on alert because he was uncomfortable in the situation." According to Myrick, however, "he never assaulted anyone."

Regarding the incident involving R.S., Myrick reported that R.S. "appeared intoxicated and was making statements that he was sick and was going to die." According to Myrick, R.S. spit on him. Myrick "informed the deputy yet he did nothing about it." Myrick and R.S. "were placed together in a holding cell." Dr. DeFrancesco's report did not indicate what Myrick said happened after this.

Dr. DeFrancesco recommended placement in a residential substance abuse treatment program with psychiatric medication, followed by continued treatment in a sober home or on an outpatient basis with a combination of support group meetings and individual therapy. Myrick also submitted a letter from a substance abuse assessor, which stated that Myrick met the medical criteria for residential treatment.

The People filed an opposition to Myrick's request arguing he was neither eligible nor suitable for mental health diversion. Among other things, the People argued that Myrick posed an unreasonable risk of danger to public safety because he was likely to commit a "super strike" offense.

D. *Hearing on Request for Mental Health Diversion*

The court held a pretrial hearing on the request for mental health diversion. At the hearing, the parties took opposing positions as to Myrick's eligibility and suitability for mental health diversion, including whether he

posed an unreasonable risk of danger to public safety or was likely to commit a "super strike" offense.

The court denied the request for diversion. The court concluded that Myrick was "eligible but not suitable for mental health diversion." Specifically, the court found that Myrick would pose an unreasonable risk of danger to public safety if treated in the community. The court based this finding on Myrick's criminal history, the violent nature of the charged offenses, the injuries sustained by the victims, and Myrick's symptomology, including hallucinations and fear of others.

E. *Trial and Sentencing*

In a jury trial, Myrick was found guilty of all three charges and the great bodily injury enhancement. The court sentenced him to five years in state prison.

## DISCUSSION

Myrick argues the trial court erred by denying his pretrial request for mental health diversion. We disagree.

*A. Applicable law and standard of review*

Pretrial mental health diversion under section 1001.36 authorizes "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment . . . ." (*Id.*, subd. (f)(1).)

To qualify, the defendant must be both eligible and suitable for diversion. A defendant is eligible for diversion if two criteria are met: (1) the defendant has been diagnosed with a qualifying mental disorder, and (2) the mental disorder was a significant factor in the commission of the charged offense. (§ 1001.36, subd. (b)(1), (2); *Sarmiento v. Superior Court* (2024) 98

6

Cal.App.5th 882, 891.) "If the defendant meets the two enumerated eligibility requirements, 'the court must consider whether the defendant is suitable for pretrial diversion.' (§ 1001.36, subd. (c).)" (*People v. Brown* (2024) 101 Cal.App.5th 113, 120 (*Brown*).)

A defendant is suitable for pretrial diversion if four criteria are met: (1) in the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment; (2) the defendant consents to diversion and waives the right to a speedy trial; (3) the defendant agrees to comply with treatment as a condition of diversion; and (4) "[t]he defendant will not pose an unreasonable risk of danger to public safety, as defined in section 1170.18, if treated in the community." (§ 1001.36, subd. (c)(1)-(4).)

As to the last of these suitability requirements, section 1170.18, subdivision (c) defines an "unreasonable risk of danger to public safety" to mean "an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." Violent felonies that fall within this meaning are "commonly referred to as super strikes." (*People v. Valencia* (2017) 3 Cal.5th 347, 351, fn. 3.) Included within this list is "[a]ny homicide offense, including any attempted homicide offense." (§ 667, subd. (e)(2)(C)(iv).)

To find an unreasonable risk of danger to public safety, "a trial court necessarily must find the defendant is 'likely to commit a super-strike offense.' " (*People v. Moine* (2021) 62 Cal.App.5th 440, 450 (*Moine*).) In another context, our Supreme Court has concluded that someone is considered "likely" to commit an offense if " 'the person presents a *substantial*

*danger*, that is, a *serious and well-founded risk*, that he or she will commit such crimes if free in the community.' " (*People v. Roberge* (2003) 29 Cal.4th 979, 982 [construing Welf. & Inst. Code, § 6600, subd. (a)(1)].)

In determining whether the defendant poses an unreasonable risk of committing a super-strike offense, the trial court may consider "the opinions of the district attorney, the defense, or a qualified mental health expert" as well as "the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." (§ 1001.36, subd. (c)(4).)

Even if a defendant satisfies the eligibility and suitability requirements, the trial court may still exercise its discretion to deny mental health diversion. (See *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1080 [mental health diversion is ultimately discretionary, not mandatory, even if all statutory requirements are met].)

On appeal, we review the court's ultimate decision whether to grant or deny a motion for mental health diversion for abuse of discretion. (*Brown, supra*, 101 Cal.App.5th at p. 121.) "The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712, fns. omitted.) A court abuses its discretion when it applies the wrong legal standard or bases its decision on express or implied factual findings that are not supported by substantial evidence. (*Moine, supra*, 62 Cal.App.5th at p. 449.)

B.    *Analysis*

Myrick contends the trial court abused its discretion by denying mental health diversion because its findings are not supported by substantial

evidence. Although Myrick raises several issues involving his *eligibility* for mental health diversion, the trial court expressly found that he *was* eligible.[4] Thus, the dispositive issue here is whether there is substantial evidence to support the trial court's finding that Myrick was not *suitable* for mental health diversion because he posed an unreasonable risk of danger to public safety if treated in the community. Because we conclude there is substantial evidence to support this finding, we affirm the judgment.

As we have explained, an "unreasonable risk of danger to public safety" means "an unreasonable risk that the petitioner will commit" a super-strike offense (§ 1170.18, subd. (c)), which includes "[a]ny homicide" or "attempted homicide offense." (§ 667, subd. (e)(2)(C)(iv).) Criminal homicide includes either murder or manslaughter. (*People v. Beltran* (2013) 56 Cal.4th 935, 941.)

Taken together, Myrick's criminal history, the nature of the charged offenses, the injuries sustained by the victims, and Myrick's mental health symptoms support the trial court's unreasonable risk finding. Myrick's juvenile offenses included carrying a weapon, assault, obstruction, and robbery. As an adult, he served eight years in prison for robbery. The charged assault offenses both involved violent and unprovoked attacks targeting the head or face of unsuspecting victims and resulting in serious injuries. Myrick's assault on J.B. was forceful enough to knock him to the ground and cause him to hit his head on the curb and lose consciousness. If J.B. had died from the impact, these facts could have supported a

---

4 Specifically, Myrick argues he was not ineligible for diversion merely because Dr. DeFrancesco believed further "clarification of his diagnostic picture" was expected and one of Myrick's test scores suggested possible "malingering." These issues are irrelevant to the basis for the trial court's ruling because it explicitly found Myrick had been diagnosed with a qualifying mental disorder and *was* eligible for mental health diversion.

conviction for second degree, implied malice murder. (See *People v. Cravens* (2012) 53 Cal.4th 500, 508–512 [upholding second degree murder conviction where defendant punched victim in head causing him to fall and sustain fatal injury hitting head on ground].) Myrick's assault on R.S. involved about 12 punches to the head and face of an unresisting victim that were forceful enough to cause multiple fractures of the bones, including orbital and nasal fractures.

Myrick's mental health symptoms included hearing voices that "commented on him and his situation" and were not fully controlled with antipsychotic medication. In the juvenile system, he had learned "he had to fight or he would be victimized." After his brother's murder, Myrick developed a "fear [of] people whom he did not know" and "got into trouble because he might carry a weapon for self-protection and when he was threatened he would fight back." He admitted that at the time of the J.B. assault, "there were a lot of unfamiliar people" around and "he was on alert because he was uncomfortable in the situation." For the other charged assault, he accused R.S. of instigating the fight by spitting on him, even though no other evidence supported this version of events.

When considered with Myrick's criminal record, the level of force and targeted body area in each of the charged assaults, and the severity of the resulting injuries, these facts were sufficient for the trial court to conclude there was an unreasonable risk that, if treated in the community, Myrick would react to a perceived threat from a stranger with deadly force. Such a killing could at least qualify as voluntary manslaughter, a super-strike offense. (*People v. Flannel* (1979) 25 Cal.3d 668, 674 [killing committed with honest but unreasonable belief in need for self-defense is voluntary manslaughter].)

Moreover, the statute also permitted the trial court to consider "the opinions of the district attorney" in deciding whether Myrick posed an unreasonable risk to public safety. (§ 1001.36, subd. (c)(4).) The district attorney expressed the opinion that he did pose such a risk.

We reject Myrick's arguments to the contrary. First, Myrick contends the trial court erred by referring to the violence of the charged assaults "as though Myrick had already been convicted." But the statute expressly permits the court to consider "the current charged offense" in making this determination. (§ 1001.36, subd. (c)(4).) Nothing in the statute "precludes a trial court from relying primarily, or even entirely, on the circumstances of the charged offense or offenses in denying a motion for diversion." (*People v. Bunas* (2022) 79 Cal.App.5th 840, 862.)

Second, Myrick contends "the court failed to take into account that [he] had no previous criminal record and had never before committed a super strike offense." As we have discussed, however, he did have both a juvenile and adult criminal record. Nor is it determinative that he has never actually committed a super-strike offense before. (*People v. Hall* (2016) 247 Cal.App.4th 1255, 1266.)

Finally, Myrick argues that his case is similar to *Moine, supra*, 62 Cal.App.5th 440, in which the court reversed an order denying mental health diversion. We disagree. *Moine* is factually distinguishable because (1) the charged offenses there involved only an ordinary fistfight and a verbal threat (*id*. at pp. 444–445); (2) there is no indication Moine targeted the victim's head or face in the fistfight; (3) the victims of the charged offenses suffered no serious or great bodily injury (*ibid*.); (4) Moine's criminal record only included misdemeanors and no prison time (*id*. at pp. 450–451); and (5) Moine had no

11

similar history of hearing voices, fearing strangers, carrying a weapon, or getting into fights.

Moine is also distinguishable because the court there relied on the fact that the defendant had been out of custody on bail for over two years before the diversion hearing. (*Moine, supra*, 62 Cal.App.5th at pp. 447, 451.) According to the Court of Appeal, this "indicate[d] the [trial] court necessarily found that Moine was not likely to cause 'great bodily harm to others' if released." (*Id*. at p. 451.) The court explained: "It is logically inconsistent to deny mental health diversion on the ground that Moine was likely to commit a super strike offense, while simultaneously finding he was not likely to inflict great bodily injury on persons in the community." (*Ibid*.) The same is not true here. Myrick was in custody at the time of the diversion hearing and the trial court at the most recent bail review hearing had found "he seems to be a danger to others."

We conclude substantial evidence supports the trial court's finding that Myrick was not suitable for mental health diversion because he posed an unreasonable risk of danger to public safety if treated in the community. (§ 1001.36, subd. (c)(4).) Accordingly, the trial court did not abuse its discretion in denying Myrick's request for mental health diversion on this ground.[5]

---

[5] We also reject Myrick's argument that the trial court "may have" erroneously assumed he did not meet the criteria for residential care. The trial court merely asked for and received clarification from defense counsel on this point before making its ruling. Defense counsel then clarified that Myrick "does meet the medical criteria for residential" treatment. Immediately following this clarification, the court confirmed that "the plan would be to set him up with an enhanced dual diagnosis mental health and residential treatment program." In its final ruling, the court did not question the fact that Myrick met the criteria for such a program.

## DISPOSITION

The judgment is affirmed.


BUCHANAN, J.

WE CONCUR:


O'ROURKE, Acting P. J.


IRION, J.